AAA VALLEY GRAVEL,
INC., Appellant,

v.

Alicia TOTARO and Herman
Ramirez, Appellees.

Alicia Totaro, Cross–Appellant,

v.

AAA Valley Gravel, Inc., Cross–Appellee.

Nos. S–12207, S–12237.

Supreme Court of Alaska.

Oct. 30, 2009.

As Amended Jan. 19, 2010.

Rehearing Denied Jan. 19, 2010.

William G. Royce, Law Office of William G. Royce, Anchorage, for Appellant/Cross–Appellee.

Richard L. Harren, Law Offices of Richard L. Harren, P.C., Wasilla, for Appellee/Cross–Appellant Alicia Totaro.

Ross A. Kopperud, Palmer, for Appellee Herman Ramirez.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

PER CURIAM.

## I. INTRODUCTION

A property owner leased gravel mining rights to a lessee. The lessee in turn leased its rights to a sublessee. The sublessee assumed the lessee's duty to pay royalties to the property owner and agreed to pay overriding royalties to the lessee. The lessee later assigned the overriding royalties to an assignee. After more than a decade of operating under these arrangements, the sublessee purchased the property under a warranty deed with no title exception for the lease and then stopped paying the overriding royalties to the assignee.

The assignee sued the sublessee for the overriding royalties. The sublessee claimed it is not liable because the original lease is not exclusive and, as the new owner of the property, it can extract gravel in its own right. Alternatively, the sublessee claimed the former property owner should pay the overriding royalties under the title covenants of the warranty deed. The trial court held the sublessee liable to the assignee for the overriding royalties and ruled that the warranty deed covenants did not shift this liability to the former property owner. Because the trial court failed to make necessary findings of fact and conclusions of law regarding both (1) the interpretation of the lease as to its exclusivity and (2) a reformation analysis for the warranty deed, this portion of the trial court's decision is vacated and remanded for further proceedings.

A related holding based on additional facts is important only if the sublessee ultimately is found liable to the assignee for past or future overriding royalty payments. About seven years after assigning all of the overriding royalties to the assignee, the lessee purported to assign fifty percent of the overriding royalties to a second assignee. The first assignee did not protest and thus ratified the new assignment, and the sublessee honored it by paying half of the overriding royalties to the first assignee and half to the second. When the sublessee stopped paying any royalties at all, the second assignee told the first assignee that she could have back his interest in the overriding royalties. The first assignee therefore claimed the entire amount of the overriding royalties, and at trial the second assignee confirmed this arrangement. The trial court ruled that the first assignee was entitled to only fifty percent of the unpaid royalties. This ruling is reversed because the second assignee orally assigned to the first assignee his interest in the unpaid overriding royalties, his testimony confirmed the assignment, and the assignment was effective.

## II. FACTS

### A. The Ramirez/Cosmos Lease

On March 29, 1984, Bill Nelson, acting on behalf of his corporation, Cosmos Development, Incorporated, executed a gravel lease with Herman Ramirez, the owner of an approximately one-hundred-acre parcel near the Palmer–Wasilla Highway.[1] The lease was to "last as long as the economical price of gravel is feasible in this pit," and Cosmos was to pay royalties for gravel taken from the pit. The superior court found:

> After the lease was signed, Mr. Nelson invested several thousand dollars in the operation. He put in a scale and scale house. He built a road and a bridge to get the gravel from the mine to Trunk Road. He also was sued by an adjoining landowner, Mr. Schultz, when he built the road, because the road crossed Mr. Schultz's property. Mr. Nelson eventually was able to purchase a license from Mr. Schultz which allowed him legally to use the land on which the road had been constructed.

### B. The Cosmos/AAA Sublease

A few months after signing the gravel lease agreement with Ramirez, Nelson approached Bill Fuger, a Cosmos employee, and Ken Mearkle of Northland Steel. Nelson offered to transfer another of his corporations, AAA Valley Gravel, Inc., to Fuger and Mearkle and to sublease Cosmos's gravel mining rights to AAA, allowing the two men

---

1. The full text of the lease is as follows:

    Gravel Lease Agreement
    March 29, 1984
    Owner: Mr. Herman Ramirez
    Operator: Cosmos Developers Inc.
    Agreement:
    This contract is between Mr. Herman Ramirez and Cosmos Developers Inc.
    The property shall be posted with Notice of non-responsibility.
    This contract shall last as long as the economical price of gravel is feasible in this pit.
    As the pit receeds [sic] into the property all slopes shall be prepared to owners [sic] reasonable requests.
    All major haulers shall show proof of liability upon request of pit operator.
    Operator agrees to dig test holes, for Owners [sic] benefit, to determin[e] water table. Operator shall use deligence [sic] to stay 8 feet above same. Operator shall dig these test holes a minimun [sic] of every 1000 feet.
    If it is feasible, Owner agrees to let operator excavate a lake for extra gravel, this can only be done with owners [sic] full control.

    Until bridge is built into property Owner is to receive 50 cents per yard of gravel sold.
    [W]hen bridge or culvert is installed, Owner's 50 cents per yard is to be reduced to 35 cents per yard.
    The operator is currently building a large tromo washing and seperation [sic] plant. This plant will start washing material on owners [sic] property. The owner shall receive an additional 30 cents per yard maximum (the 30 cents is negociable [sic] downward if market price changes.) Out of this 30 cents per yard the owner agrees to pay 5 cents per yard for a manager if owner is not available to help operator manage.
    The owner has the right to inspect the operators [sic] books and agrees to keep everything strictly confidintual [sic].
    Owner and operator agree to do all business in a family style, good faith, and honorable relationship.

    | /s/Bill Nelson | /s/Herman Ramirez |
    |---|---|
    | Bill Nelson (Cosmos) | Herman Ramirez (owner) |

to take over the Cosmos operation. Fuger and Mearkle were attracted to this proposal and Fuger sought legal advice about the Cosmos/Ramirez lease.

Fuger's lawyer, J.B. McCombs, wrote a single-spaced six-page letter critical of the Ramirez/Cosmos lease, noting myriad problems and unanswered questions. McCombs noted the lease's lack of a legal description, its silence on whether the gravel mining rights were assignable, the indefinite term of the agreement, its ambiguity as to whether or not the mining rights were exclusive,[2] Cosmos's failure to conduct a title search to verify that Ramirez was the sole owner of the gravel pit and to verify that the property had no encumbrances, and the fact that the agreement had been neither notarized nor recorded and would not be recordable unless it were notarized.

After considering McCombs's letter, Fuger, Mearkle, and Nelson met with Nelson's lawyer, Michael Patterson, who drafted a lease agreement between Cosmos and AAA. This sublease was signed on December 20, 1984, by Nelson on behalf of Cosmos and Fuger on behalf of AAA, and it became effective on January 1, 1985. Under this sublease AAA agreed to pay (1) the royalties due Ramirez under the Ramirez/Cosmos lease and (2) overriding royalties to Cosmos.[3]

The term of the sublease was "as long as it is economically feasible to extract gravel from said property." The sublease was expressly "exclusive" and "contingent upon the Ramirez lease," and further provided that "[b]oth parties are familiar with the letter of December 12, 1984"—a reference to McCombs's detailed critique of the Ramirez/Cosmos lease. The sublease bound AAA to "take all reasonable steps to protect [Cosmos's] lease with Ramirez." It also provided that "this agreement may be recorded by [AAA]," but although the sublease was notarized and contained a property description, it never was recorded.

After the Cosmos/AAA sublease took effect, AAA proceeded to further develop the pit and take gravel from it. The superior court found:

> AAA proceeded to develop the mine, which required the expenditure of substantial amounts of money and the construction of related facilities. Pursuant to the lease, AAA paid Mr. Ramirez the royalties to which he was entitled under the Cosmos/Ramirez lease, and it paid additional royalties to Cosmos under the Cosmos/AAA lease. Mr. Ramirez evidently was never told about the Cosmos/AAA lease, nor was he involved in the negotiations that led to the lease. But he clearly had to know that AAA, not Cosmos, was operating there, since AAA was the entity that sent him the royalty checks.

## C. Assignment of Overriding Royalties

In October of 1986 Cosmos assigned all of its overriding royalty rights under the sublease to Nelson's wife, Alicia Totaro. On November 21, 1986, the State of Alaska involuntarily dissolved Cosmos for failure to file a biennial report.

Nelson formed a new corporation, Cosmos Development, Inc., in April 1991, but it filed for bankruptcy later that year. The bankruptcy schedules referenced assets and liabilities dating back to 1985, suggesting that Nelson had intended that the second Cosmos corporation simply step into the shoes of the first Cosmos corporation—the parties do not question this. However the bankruptcy schedules made no mention of the Ramirez/Cosmos lease or the Cosmos/AAA sublease, and Nelson voluntarily dissolved the second Cosmos corporation in 1992, declaring

---

**2.** As to exclusivity, McCombs wrote:

> One major problem with this Agreement is that it does not state that this is an exclusive agreement with Mr. Ramirez. Under this agreement, there is a very good argument that he could execute a similar, non-exclusive agreement with another party for this same property. That other party could then access the property and mine gravel on a different portion of this same land. The agreement should

clearly state that this is an exclusive right to mine gravel from this property.

**3.** "[A]n overriding royalty interest is 'a percentage of the gross production payable to some person other than the lessor or persons claiming under the lessor.'" *Allen v. Alaska Oil & Gas Conservation Comm'n*, 1 P.3d 699, 700 n. 1 (Alaska 2000) (quoting 38 AM JUR 2D *Gas and Oil* § 215 (1999)).

"no assets of the corporation to distribute to shareholders or to be applied toward the corporation's debts and liabilities." Nothing in the record suggests that either Cosmos corporation had assigned anything to Totaro other than the overriding royalty interest.

Meanwhile Totaro and Nelson legally separated and Totaro moved to California. AAA was aware of these changes and sent its overriding royalty payments to Totaro in California. In July 1993 Nelson directed AAA to disburse fifty percent of the overriding royalties to Sam Oil Company, a company owned by Mike Palmquist. The superior court observed that it was "utterly opaque . . . why Mr. Nelson chose to have half of the royalties sent to Mr. Palmquist" and that "[t]he explanations offered by Mr. Nelson and Mr. Palmquist were vague, internally inconsistent, inconsistent with each other, and inconsistent with Mr. Nelson's July 1, 1993 letter to AAA." But the court found that "neither Ms. Totaro nor AAA challenged the assignment—to the contrary, AAA paid one-half of the royalties to Ms. Totaro and one-half to Sam Oil Company without any demur from Ms. Totaro." The court concluded that "Ms. Totaro and AAA thereby ratified the assignment to Sam Oil."

### D. The AAA Purchase of the Property from Ramirez

AAA did not stop making royalty payments under the Ramirez/Cosmos lease and the Cosmos/AAA sublease until AAA purchased the property from Ramirez in August 1998. The purchase was effected through an earnest money agreement signed on August 5, 1998,[4] and was made final by a warranty deed signed August 26, 1998. The warranty deed did not mention the Ramirez/Cosmos lease as an exception to title.

The superior court described the circumstances of the sale as follows:

Mr. Ramirez decided some time in July 1998 to sell the entire property. He placed an advertisement in the newspaper offering the property. He also came to the property and asked Mr. Fuger and Mr. Mearkle whether they were interested in purchasing the property. To put some pressure on them to [buy], he indicated to them that he had another prospective buyer, even though no one had approached him with a concrete offer.

AAA decided it wanted to purchase the property. According to Mr. Fuger, AAA felt it had no choice but to purchase the property because of the legal deficiencies in the Cosmos/Ramirez lease. In particular, Mr. Fuger believed that that lease was unenforceable, which meant that if someone other than AAA purchased the property, AAA could be forced to leave, losing its only asset and source of revenue. The court found this testimony credible, given the legal advice Mr. Fuger had received from Mr. McCombs.

AAA and Mr. Ramirez then negotiated the terms of the sale. During these negotiations, Mr. Fuger and Mr. Ramirez discussed the impact of the sale on the Cosmos/Ramirez and Cosmos/AAA leases. Mr. Fuger insisted at trial that he asked Mr. Ramirez if there was a lease on the property and that Mr. Ramirez said no. Mr. Ramirez claimed to have no recollection of that conversation, and he asserted that he thought the Cosmos/Ramirez lease had expired. The court has difficulty with all of this testimony. Mr. Fuger was well aware of the Cosmos/Ramirez lease—indeed, Mr. Fuger relied on what he perceived to be the unenforceability of that lease as the reason he purchased the property. Mr. Ramirez also was well aware of the lease, since he signed it; and he cannot very well have thought it expired since he was continuing to receive royalty payments from it. Mr. Ramirez in particular came across as a very clever and accomplished businessman; the court finds it hard to believe he was not well aware of the precise status of the Cosmos/Ramirez lease, and that had he thought the lease had expired, he would have made that fact very clear to AAA.

---

4. The parties used a pre-printed form which left a blank to be filled in for the type of deed to be used. The parties did not fill in that blank, but did insert "N/A" in the space for intended nonstandard encumbrances.

The more likely scenario is that Mr. Fuger and Mr. Ramirez thought at the time that if AAA bought the property, then neither of them would have to worry about the Cosmos/Ramirez lease anymore, and that their testimony at trial was colored by their effort to blame each other for any liability that might be owed to Ms. Totaro. This is supported by the fact that Mr. Fuger and Mr. Ramirez each testified at trial that they agreed that AAA would not have to pay Mr. Ramirez once it purchased the property, that they discussed whether AAA would have to pay Ms. Totaro, and that Mr. Ramirez stated that Mr. Fuger should talk to an attorney about any responsibilities AAA had to Ms. Totaro. This testimony indicates that Mr. Fuger and Mr. Ramirez were well aware of the leases at issue and that they decided not to deal with the ramifications of the sale on the Cosmos/AAA lease.

After AAA bought the property it stopped paying overriding royalties. Totaro called Fuger in October 1998 to ask why she had not received a royalty check. Fuger informed her that he had purchased the pit and that she would no longer be receiving royalty checks. She also called Palmquist—he was not interested in suing and later testified that he told her "I wanted her to have my half."

## III. PROCEEDINGS

In July 2000 Totaro filed suit against AAA and Fuger. She sought damages for the overriding royalty payments allegedly due, claiming that "Fuger was well aware of the fact that the royalty payments to Ms. Totaro was Mr. Nelson's way of making child support payments." She made it clear that she was claiming one hundred percent of the overriding royalty, alleging:

In 1993, Nelson took back 1/2 of the royalties he had originally assigned to plaintiff and assigned them to Mike Palmquist to pay a debt relating to the gravel pit. At some point Mr. Palmquist was either paid in full or will be paid in full and then 100% of the royalties will again go to Ms. Totaro.

She asserted claims for breach of contract, tortious interference with a contract, and emotional distress, and she asked for compensatory and punitive damages.

AAA and Fuger answered, denying liability. In addition AAA filed a third-party complaint against Ramirez for breach of contract and breach of warranty of title, alleging that "[i]f the court should find for plaintiff, Alicia Totaro, in this matter, then Mr. Ramirez breached his warranty against encumbrances." Ramirez answered the third-party complaint, denying liability to AAA and alternatively counterclaiming for rescission of the property transaction.

AAA and Fuger moved for partial summary judgment on all of Totaro's claims except the breach of contract claim against AAA. This motion was granted. AAA also moved for summary judgment on its claims against Ramirez, and Ramirez cross-moved for summary judgment. The court ordered that all of the claims between AAA and Ramirez be reserved for trial, but did rule that the Ramirez/Cosmos lease was an encumbrance on title to the property.

The case was tried to the superior court on July 22 and 23 and September 16, 2003. The court determined that Totaro was entitled to one-half of the overriding royalties because "AAA remained bound by the [Cosmos/AAA sub]lease even after it purchased the property from Mr. Ramirez. By not paying Ms. Totaro the royalties under that lease, AAA breached the lease." But the court refused to award Totaro the unpaid overriding royalties that had been assigned to Palmquist, ruling only that Totaro ratified the assignment to Palmquist without mentioning Totaro's claim that Palmquist had reassigned his half of the unpaid overriding royalties to her. The court further found that AAA and Ramirez "knew about both the [Ramirez/Cosmos] lease and the Cosmos/AAA lease when they negotiated and arrived at the land sale agreement" and "[g]iven that knowledge, neither party could reasonably have relied upon any alleged misrepresentation by the other party." The court also found that AAA knew of its potential obligation to continue to pay royalties to Totaro under the Cosmos/AAA sublease, but was willing to purchase the property "notwithstanding those concerns." The court concluded that Ramirez was not

responsible under the warranty deed for payment of Totaro's overriding royalties.

Final judgment was issued on December 13, 2005, establishing AAA's monetary obligation to Totaro, ordering specific performance of AAA's overriding royalty obligation to Totaro, and dismissing AAA's claim against Ramirez. AAA appeals and Totaro cross-appeals.

## IV. CONTENTIONS ON APPEAL

AAA presents three contentions on appeal, two relating to Totaro's judgment against AAA and one relating to the trial court's refusal to hold Ramirez liable on the warranty deed. As to Totaro, AAA argues that: (1) Cosmos's assignment to Totaro was gratuitous and therefore revocable and was terminated by Cosmos's dissolution; and (2) because the Ramirez/Cosmos lease was non-exclusive, AAA can extract gravel from the property as the owner of the property free from obligations under the Ramirez/Cosmos lease and the Cosmos/AAA sublease. AAA's argument concerning Ramirez is that the covenant against encumbrances inherent in its warranty deed encompasses Totaro's claim for overriding royalty rights arising under the Cosmos/AAA lease.

Totaro presents three arguments in her cross-appeal, arguing that the trial court erred when it: (1) failed to award her one hundred percent of the overriding royalties; (2) stated in a finding that the Ramirez/Cosmos lease would last only as long as the property was unsuitable for subdivision purposes; and (3) permitted AAA to deduct a certain amount for additives from asphalt tonnages produced at the pit.

We discuss each of these contentions in turn.

### A. AAA's Arguments with Respect to Totaro's Judgment

#### 1. The assignment of overriding royalties was irrevocable.

■ AAA argues that Totaro lacks the power to assert rights to the overriding royalties. We apply our independent judgment in reviewing this question and adopt the rule of law most persuasive in light of precedent, policy, and reason.[5] Alaska Statute 10.06.633(g) provides:

> An action arising out of a contract assigned by a corporation dissolved under this section may be brought in the name of the assignee. The fact of assignment and of purchase by the plaintiff shall be set out in the complaint or other process.

Cosmos assigned its right to overriding royalties from the Cosmos/AAA sublease to Totaro and notified AAA of the assignment in 1986, before Cosmos was dissolved.[6] AAA acknowledges that Cosmos was not dissolved at the time of the assignment but argues that the assignment was gratuitous and therefore revocable, and as such was terminated by Cosmos's subsequent dissolution.

AAA's argument is not supported by applicable principles of law. According to the Restatement (Second) of Contracts:

> Unless a contrary intention is manifested, a gratuitous assignment is irrevocable if (a) the assignment is in a writing either signed or under seal that is delivered by the assignor;
>
> or (b) the assignment is accompanied by delivery of a writing of a type customarily accepted as a symbol or as evidence of the right assigned.[7]

Commentary to this section states that delivery may be made either to the donee or to a third person on his behalf.[8] Nelson mailed AAA a signed and sealed letter notifying

---

**5.** *Summers v. Hagen,* 852 P.2d 1165, 1169 (Alaska 1993).

**6.** AAA argues that "Totaro neither purchased nor was assigned the Cosmos–AAA contract. She may not therefore bring an action for breach of that contract." Although it appears true that Cosmos did not assign to Totaro all of its rights under the Cosmos/AAA sublease, it did assign one specific right under that sublease: the right to overriding royalty payments. A corporation need not assign every right it has under a contract for AS 10.06.633(g) to preserve the assignee's capacity to assert the particular rights that were assigned.

**7.** RESTATEMENT (SECOND) OF CONTRACTS § 332 (1981).

**8.** *Id.* § 332, cmt. e.

AAA of the prior assignment to Totaro and directing payment of all royalties to her. Although this evidentiary writing was delivered a few months after the actual assignment, it nevertheless rendered the assignment irrevocable unless a contrary intention was manifested. No such intention was manifested in 1986 when the assignment was made and notice was delivered to AAA.

AAA contends that Nelson manifested an intention that the assignment be revocable when in 1993 he purported to assign half of the overriding royalties previously assigned to Totaro to Palmquist's Sam Oil Company. But the Restatement rule concerning the manifestation of a contrary intention necessarily requires that the manifestation take place contemporaneously with the delivery of the assignment, otherwise an assignor would have the power at any time to revoke any gratuitous assignment no matter how irrevocable it might appear to be at the time of delivery.

We therefore conclude that the assignment was irrevocable and Cosmos's subsequent dissolution did not affect its continuing validity.

**2. We remand for further proceedings on the issue of AAA's duty to pay overriding royalties after becoming the owner of the property.**

■ At the end of the trial the court found that both the Ramirez/Cosmos lease and the

Cosmos/AAA sublease were valid, neither had expired, and AAA was not relieved of its duty to continue making overriding royalty payments to Totaro. AAA contends that it no longer owes overriding royalties under the Cosmos/AAA sublease because the Ramirez/Cosmos lease was not exclusive and AAA is entitled to exercise Ramirez's retained right to extract gravel. The trial court did not directly address this argument, but AAA's potential liability to Totaro turns on whether the Ramirez/Cosmos lease was intended to be an exclusive lease.

Contract interpretation generally is a question of law.[9] The goal of contract interpretation is to give effect to the parties' reasonable expectations.[10] If the contract language is unambiguous, the parties' intent is generally determined by the instrument itself,[11] but "extrinsic evidence is always admissible on the question of meaning of the words of the contract itself." [12] Courts look to extrinsic evidence of the parties' contractual intent only if the language of the instrument is ambiguous.[13] Relevant extrinsic evidence includes "the parties' conduct, goals sought to be accomplished, and surrounding circumstances at the time the contract was negotiated." [14]

The Ramirez/Cosmos lease does not mention exclusivity,[15] but even though silent, some of its provisions may make sense only if the lease had been intended to be exclusive.[16]

9. *Norville v. Carr–Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004) (citing *Little Susitna Constr. v. Soil Processing, Inc.*, 944 P.2d 20, 23 (Alaska 1997)). On appeal, this court substitutes its own independent judgment regarding questions of law. *Old Harbor Native Corp. v. Afognak Joint Venture*, 30 P.3d 101, 104 (Alaska 2001) (citing *Alaska Energy Auth. v. Fairmont Ins. Co.*, 845 P.2d 420, 421 (Alaska 1993)).

10. *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 383 (Alaska 2004) (citing *Exxon Corp. v. State*, 40 P.3d 786, 793 (Alaska 2001)); *Norville*, 84 P.3d at 1004; *Williams v. Crawford*, 982 P.2d 250, 253 (Alaska 1999).

11. *Ellingstad v. State, Dep't of Natural Res.*, 979 P.2d 1000, 1004 (Alaska 1999) (citing *Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 124 (Alaska 1991)).

12. *Casey*, 92 P.3d at 383 (citing *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch.*

*Dist.*, 778 P.2d 581, 584 (Alaska 1989) (citing RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. b (1981))).

13. *Williams*, 982 P.2d at 253.

14. *Neal & Co., Inc. v. Ass'n of Village Council Presidents Reg'l Hous. Auth.*, 895 P.2d 497, 502 (Alaska 1995).

15. *See supra* notes 1–2.

16. For example, Cosmos is referred to as the "operator" or "pit operator." Cosmos assumed pit-wide responsibilities regarding slope preparation as the pit recedes and undertook the responsibility to dig test holes for the owner's benefit every 1,000 feet. The lease contemplated that Cosmos would build a bridge to get better access to the gravel and would build a large washing and separation plant on the property. It might be inconsistent with the pit-wide responsibilities

Thus the Ramirez/Cosmos lease is ambiguous on its face as to exclusivity.

Contract interpretation involves fact-finding when facially ambiguous contract language read in the context of all relevant extrinsic evidence remains ambiguous:

> Interpreting a written contract is generally a task for the trial court; however, interpretation becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points toward conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning. In such cases, the trial court initially determines whether the extrinsic evidence meets the criteria to create a [question of fact]; when the court finds that the extrinsic evidence does not conflict or is incompatible with the terms of the written contract, interpretation remains a question of law for the court's determination.[17]

Here, some extrinsic evidence implies that the Ramirez/Cosmos lease was non-exclusive. Ramirez testified that he had no discussions with Nelson as to exclusivity; a reasonable inference may be drawn that in the absence of any discussions about exclusivity, Ramirez and Nelson did not make an agreement for exclusivity. The trial court found Ramirez's motivation to enter into a gravel lease was to make his property suitable for subdivision and development; a reasonable inference may be drawn that Ramirez was interested in subdivision development as soon as possible and this would be facilitated by multiple gravel extraction operations on the large property, perhaps in more than one pit.[18]

The trial court also found that Ken Mearkle was "an independent gravel operator working under the business name of Northland Steel, which in turn was working in the Ramirez pit at the same time as Cosmos." Although Mearkle testified that he had a contractual arrangement with Cosmos and

that he made his Cosmos-related payments directly to Cosmos, Ramirez testified that he believed he received several checks from Mearkle relating to operations in the gravel pit. A reasonable inference may be drawn that Mearkle operated in the pit under separate arrangements with both Ramirez and Cosmos, thus supporting the notion that the Ramirez/Cosmos lease was not exclusive.

Finally, the trial court found that Nelson, on behalf of Cosmos, submitted a proposed new lease to Ramirez to cure what AAA and Nelson believed were deficiencies in the Ramirez/Cosmos lease, but that Ramirez did not sign the proposed lease. A reasonable inference may thus be drawn that Ramirez did not agree that the Ramirez/Cosmos lease was intended to be exclusive.

On the other hand there is much to suggest that the Ramirez/Cosmos lease was intended to be exclusive. Ramirez stated in an affidavit that after he purchased the one hundred acres—and converted the buildings on the site to a sixteen-unit apartment complex—he wished to subdivide the remainder of the property but he was told that the property was "too steep and rolling to be suitable for a subdivision." Accordingly, Ramirez stated: "In 1984, I advertised in the newspapers *for someone to develop my property into [a] gravel pit.*" (Emphasis added.) Nelson responded and around March 15, 1984, "we entered into letter of intent concerning the development of the pit." Two weeks later the letter of intent was replaced by the Ramirez/Cosmos lease. Ramirez further stated:

> Under the agreement, Cosmos agreed to pay me a royalty of fifty cents a yard for gravel extracted from the pit until a road was built to Trunk Road and a bridge or culvert was installed at which time the royalty would be reduced to thirty five cents a yard. Once the road was put in to [T]runk [R]oad and a washer was brought

---

assumed by Cosmos, the contemplated improvements, and Cosmos's status as the pit operator to conclude that Ramirez could extract gravel from the same pit independent of the lease.

**17.** *Little Susitna Constr. Co.,* 944 P.2d at 23 (internal citations omitted).

**18.** The record is undeveloped about the boundaries and contours of the property, the location of gravel deposits, and the possibility of more than one pit.

in to process material, I was to receive an additional thirty cents a yard which would be reduced by five cents if I didn't help manage the pit.

Bill Fuger worked for Bill Nelson at the time. Ken [Mearkle] was also working in the pit as well. Sometime in 1985, Bill Fuger *took over running the pit* from Bill Nelson and *ran the pit* under the name of AAA Valley Gravel Inc.

I was not a party to the [Cosmos/AAA] agreement. I was aware that Bill Fuger had taken over the pit because he sent me royalty checks from 1985 through August 1998 when I sold the pit to AAA. . . .

Up to the time I sold the property to AAA . . . I oversaw the management of the apartments that were located a couple hundred feet from the gravel pit operation. I had no involvement with the operation of the gravel pit. (Emphasis added.)

Ramirez's advertisement for "someone to develop my property into [a] gravel pit" implies exclusivity, as do his references both to the improvements that Cosmos was to make and "taking over" and "running" the pit.

█ This conflicting extrinsic evidence does not clarify the ambiguity of the written gravel lease agreement. Therefore it is the trial court that should first find, as a matter of fact, whether the Ramirez/Cosmos lease is exclusive.

If the trial court finds that the Ramirez/Cosmos lease is non-exclusive, it seems doubtful that AAA could not exercise owner-retained gravel rights, even in light of the provision in the Cosmos/AAA sublease requiring AAA to take all reasonable steps to protect the Ramirez/Cosmos lease. First,

neither lease appears to compel the extraction of gravel—the leases appear to grant only the right to extract gravel. Second, if the Ramirez/Cosmos lease is non-exclusive, the fact that the property owner extracts gravel or allows others to extract gravel should not affect the continued legal viability of the Ramirez/Cosmos lease. Even if AAA extracts gravel under its property ownership rights, it likely would not fail "to protect" the Ramirez/Cosmos lease; but if there is a question, as the trial court suggested, whether AAA can unilaterally decide to extract gravel as an owner and not as a sublessee without violating some duty to Cosmos [19] or Totaro, that question cannot be decided without a full factual inquiry and perhaps the consideration of our cases on economic privilege. [20]

We therefore vacate the judgment as it relates to AAA's liability to Totaro and remand for further proceedings consistent with this decision.

### B. AAA's Argument with Respect to Ramirez

AAA argues that Ramirez should be responsible for paying the royalties AAA owes Totaro because Ramirez conveyed the property to AAA under a warranty deed.

Ramirez, by the trial court's account "a very careful, experienced, and clever businessman," conveyed the property to AAA by warranty deed without any express warranties of title. [21] But even if not expressly written in the instrument, by statute a warranty deed includes covenants that "at the time of the making and delivery of the deed the [property is] free from encumbrances" and "the grantor . . . will defend the title" to the property. [22] Ramirez's warranty deed ex-

---

**19.** On the record before us it is not clear who might be in a position to defend Cosmos's rights under the Cosmos/AAA sublease.

**20.** *See, e.g., RAN Corp. v. Hudesman,* 823 P.2d 646, 649 (Alaska 1991) (holding that landlord has economic privilege to interfere with tenant's assignment of lease); *Oaksmith v. Brusich,* 774 P.2d 191, 198 (Alaska 1989) (noting lack of privilege as an element of the tort of interference with prospective economic advantage); *Bendix Corp. v. Adams,* 610 P.2d 24, 31 (Alaska 1980) (holding that "where there is a direct financial interest in a contract, the essential question in determining if interference is justified is whether the person's

conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective").

**21.** Ramirez's deed was entitled "Statutory Warranty Deed" and expressly referenced AS 34.15.030, which covers form and content of warranty deeds.

**22.** AS 34.15.030(b) provides:

A deed substantially in the form set forth in (a) of this section, when otherwise duly executed, is considered a conveyance in fee simple to the

pressed some standard exceptions to title, such as patent reservations and recorded easements, but did not mention the Ramirez/Cosmos lease.[23]

The trial court refused to enforce the title covenants of Ramirez's warranty deed with respect to the Ramirez/Cosmos lease, reasoning that both Ramirez and AAA knew of the existence of the lease, both Ramirez and AAA were aware of the "potential legal issues revolving around the sale of the property," and:

> While there is no direct evidence that the legal uncertainties affected the purchase price, the court has no doubt that AAA carefully evaluated the relative costs and benefits of proceeding and decided that it was best to proceed and to run the risk that AAA would be held liable under the Cosmos/AAA lease.

The fundamental flaw in the trial court's analysis is that AAA's evaluation and assumption of risk cannot be determined without considering the type and express contents of the deed AAA received. The trial court might be correct if Ramirez had con-

veyed the property to AAA by quitclaim deed without warranties.[24] But AAA's assumption of risk looks significantly different with a conveyance by warranty deed that contains no relevant exceptions to title—indeed, by conveying with a warranty deed it was Ramirez, not AAA, who "decided that it was best to proceed and to run the risk" that the Ramirez/Cosmos lease would have continued legal viability and be an encumbrance against title to the property. Had Ramirez intended to convey the property subject to the Ramirez/Cosmos lease, he could easily have inserted an appropriate exception in the statutory warranty deed.[25] But had he done so AAA likely would have viewed the risk calculations in a very different manner, perhaps demanding a significant price reduction.

In *Groff v. Kohler* we stated the general rule that a deed properly executed, delivered, and accepted is considered the final expression of parties' agreement for the transfer of land and that all prior terms of the parties' agreement are extinguished and unenforceable under the doctrine of merger.[26] But as we also stated:

---

**23.** A lease is an "encumbrance" covered by a warranty deed's title covenants. *Domer v. Sleeper*, 533 P.2d 9, 11 n. 5 (Alaska 1975). We have not yet had occasion to consider damages for a breach of a title covenant, but one could reasonably expect the grantee might be entitled to recover the lesser of (1) the cost to cure the breach, *i.e.*, the cost incurred in eliminating the encumbrance, or (2) the diminution in value caused by the encumbrance, perhaps subject to a maximum of the consideration paid for the property. 6A RICHARD R. POWELL ET AL., POWELL ON REAL PROPERTY § 81–A.06 [4][b]. Although we do not reach the adoption of these measures of damages or their application to the Ramirez/Cosmos lease if it is an encumbrance contrary to Ramirez's cove-

grantee and the heirs and assigns of the grantee, with the following covenants by the grantor: (1) that at the time of the making and delivery of the deed the grantor is lawfully seized of an indefeasible estate in fee simple to the premises described, and has the right and power to convey the premises; (2) that at the time of making and delivery of the deed the premises are free from encumbrances; and (3) that the grantor warrants the quiet and peaceable possession of the premises, and will defend the title to the premises against all persons claiming the premises. The covenants are binding upon a grantor and the heirs and personal representative of a grantor as if written in the deed.

nants of title, potential damages for that encumbrance would not necessarily be the overriding royalties due under the Cosmos/AAA sublease.

In his dissent, Justice Matthews appears to assume that the relevant encumbrance is the Cosmos/AAA sublease, noting that AAA seeks indemnity "for a contractual obligation that [AAA] itself has incurred" and asserting that "under today's per curiam decision [Ramirez] will be required to pay it." This is incorrect. It is the Ramirez/Cosmos lease that may breach Ramirez's title covenants, an encumbrance incurred by Ramirez, not AAA, and any resulting damages would have to be based on that encumbrance.

**24.** *Cf.* AS 34.15.050 (stating that a quitclaim deed passes all of the grantor's rights in the property).

**25.** *Jones v. Grow Investment & Mortgage Co.*, 11 Utah 2d 326, 358 P.2d 909, 911 (1961) ("The intention to exclude an encumbrance should be manifested in the deed itself, for a resort to oral or other extraneous evidence would violate settled principles of law in regard to deeds." (citing 7 THOMPSON ON REAL PROPERTY, PERM. ED., 210)).

**26.** *Groff v. Kohler*, 922 P.2d 870, 873 (Alaska 1996) ("Execution and delivery of a deed by the seller ... usually constitute full performance on

Professor Corbin has observed:

The doctrines of "merger" or "estoppel by deed" have never prevented the reformation of a deed in which the words of description or of conveyance fail to describe correctly or to convey the land or interest that was agreed upon.

. . . .

In line with this authority, we have previously held:

Reformation of a writing is justified when the parties have come to a *complete mutual understanding* of all the essential terms of their bargain, but by reason of mutual mistake . . . the written agreement is not in conformity with such understanding. . . . [27]

This framework should not be lightly set aside.[28] Warranty deeds provide certainty and predictability in property transactions through the express allocation of financial risk for title defects. Prospective purchasers of property often learn of title defects prior to the final closing of a transaction, and such defects may be handled in at least the following two ways: (1) the purchaser can agree to the continuance of the defect and to take the risk of loss, in which case the deed will not contain a warranty against the defect; or (2) the purchaser can agree to the continuance of the defect but rely on the seller's express warranty against the defect for later indemnity if necessary.[29]

If Ramirez contends that AAA actually agreed to accept the financial risk of the Ramirez/Cosmos lease encumbrance and that there was a scrivener's error in preparing the warranty deed, then Ramirez may seek to have the deed reformed to express the parties' actual agreement.[30] But "[a] party

his part, and acceptance of the deed by the buyer manifests his acceptance of that performance even though the estate conveyed may differ from that promised in the antecedent agreement. Therefore, in such a case, the deed is the final agreement and all prior terms, whether written or verbal, are extinguished and unenforceable.").

27. *Id.* (emphasis in original; internal citations omitted).

28. *Jones v. Grow Investment*, 358 P.2d at 911 (stating that ordinarily parol evidence is inadmissible to show exceptions to express covenants in a deed or to show the grantee knew of an encumbrance and took title subject to it, and that "[t]his rule should not be lightly disregarded for titles to real estate would be uncertain and recordation of deeds useless if their contents were to be determined by the testimony of witnesses").

29. Justice Matthews argues in his dissent that because of the availability of title insurance, a quitclaim deed is as good as a warranty deed in providing certain and predictable title to real property. It is true that in a transaction involving a quitclaim deed a title insurance policy may act as a substitute for a warranty deed, and it is also true that in a transaction involving a warranty deed a title policy may provide the only solvent source of recovery for a breach of a title covenant. But it is also true that a title policy generally contains standard exceptions from the insurance obligation that would not otherwise be implied exceptions to the title covenants of a warranty deed.

Although the title insurance policy obtained for the Ramirez/AAA transaction is not in the record, the pre-closing and closing title insurance materials reflect that (1) the Ramirez/Cosmos lease was not listed as an express exception to the title insurance, but (2) the standard exceptions to the title insurance included the exception that Justice Matthews would read into AS 34.15.030(b)— an exception for unrecorded interests in the property that could be ascertained by an inspection of the land or inquiry of the person in possession. Thus even given the existence of title insurance in this transaction, we return to the fundamental question about the allocation of financial risk for the possibility that the Ramirez/Cosmos lease was an encumbrance against the title conveyed by Ramirez to AAA: did Ramirez accept the risk of the uninsured encumbrance or was the warranty deed mistakenly drafted?

30. *Groff*, 922 P.2d at 873–74; *Wasser & Winters Co. v. Ritchie Bros. Auctioneers, Inc.*, 185 P.3d 73, 77 (Alaska 2008) ("Reformation is an equitable remedy by which a court alters the terms of a written instrument to make the writing conform with the meaning that the parties agreed upon." (citing Restatement (Second) of Contracts § 155 cmt. a (1981)). Ramirez might not be able to obtain reformation based on a mutual mistaken belief that the Ramirez/Cosmos lease was not valid and therefore not an encumbrance, because the warranty deed allocated the risk of that mistake to Ramirez. *Id.* at 78 (noting that "a party which bears the risk of mistake cannot satisfy the mutual mistake test"). Ramirez did raise the possibility of rescission in his pleadings, and rescission of a real property sales agreement has been allowed upon the clear and convincing showing of the parties' mistaken belief that title to the property in question was unencumbered. *See Matanuska Valley Bank v. Abernathy*, 445 P.2d 235 (Alaska 1968). It is conceivable that AAA or Ramirez, or both, might be able to sus-

urging reformation must establish the elements of reformation by clear and convincing evidence." [31] The trial court did not make a finding by clear and convincing evidence that AAA had, before the warranty deed was executed and delivered, agreed to waive the warranty against encumbrances with respect to the Ramirez/Cosmos lease. We therefore vacate the portion of the judgment in favor of Ramirez and remand for further proceedings to allow Ramirez the opportunity to (1) establish standing to seek reformation of his warranty deed to AAA and (2) prove by clear and convincing evidence that AAA had actually agreed to accept a deed that did not covenant against the encumbrance of the Ramirez/Cosmos lease.[32] If Ramirez cannot make a case for reformation then AAA should be entitled to recover provable damages for breach of the title covenants in the warranty deed.

## V. CONTENTIONS ON CROSS-APPEAL

### A. Overriding Royalties Assigned to Palmquist

Totaro alleged in her complaint that:

In 1993, Nelson took back 1/2 of the royalties he had originally assigned to plaintiff and assigned them to Mike Palmquist to pay a debt relating to the gravel pit. At some point Mr. Palmquist was either paid in full or will be paid in full and then 100% of the royalties will again go to Ms. Totaro.

On the first day of trial Totaro called Palmquist as a witness. Palmquist testified that he had advanced money to Nelson over the years, some of it in connection with the gravel operation, and that he received the 1993 assignment in order to repay these obligations. He testified that royalties received under the assignment had satisfied Nelson's obligation, leaving "a $200 credit." Palmquist testified as follows concerning his desire that Totaro have his half of the overriding royalties:

A: Alicia [Totaro] called me after they quit paying. I don't particularly remember the circumstances, but I remember that the context was that if she felt it necessary to go after AAA that she could have my half. You know, if she went to the effort, she could have it all.

Q: Did you tell her that?

A: I think so.

Q: And did you say that with an understanding of—did you try to sort out the legal issues about who should get what or—when you said that to her?

A: Alicia and I are not attorneys, right. We don't know the legal bullshit. Sorry. But I wanted her to understand that she didn't owe me anything, right. And I felt comfortable with the way things were and I wanted her—I wanted her to have my half.

Q: And would that be whether you had a legal right to your half or whether you didn't have anything more than Bill Nelson's cockeyed idea?

A: Exactly. Exactly.

After testimony was taken on July 23, 2003, the trial was continued until September 16, 2003. On the day before, Totaro's counsel submitted an unsigned formal written assignment of Palmquist's overriding royalty interest to Totaro.[33] At the conclusion of the evidence on September 16 the court called for all of the parties to submit proposed findings of fact and conclusions of law to serve as a substitute for final arguments. The court then stated:

I have some concerns about any effort to award more than half of the royalties to Ms. Totaro because of the fact that it directly affects the rights of Mr. Palmquist and he's not a party to the case. And I have a lot of concern about the extent to

---

tain an equitable claim for rescission on the facts of this case.

**31.** *Wasser & Winters,* 185 P.3d at 82 (citing *Adams v. Adams,* 89 P.3d 743, 752 (Alaska 2004)).

**32.** The possibility of further proceedings focused on rescission is not precluded. *See supra* note 30.

**33.** Palmquist signed the document on September 16, but Totaro did not file the signed document with the court until December 1, 2003.

which Mr. Palmquist's rights can be adversely affected by virtue of this litigation without him being a party to the case.

. . . .

[I]f liability were to be found that the most that could come out of this case is half because I can't adversely affect Mr. Palmquist's rights, ... then Mr. Palmquist would have to decide what he wants to do with the other half.

And Mr. Harren [Totaro's counsel], before you leap up and tell me about the exhibit that you attached to your opposition, that's not an exhibit formally in this case. And from my standpoint any relation—any dealings between ... Ms. Totaro and Mr. Palmquist that post date all of these events are not part of this case. They may affect whatever arrangements Mr. Palmquist chooses to make. If I find liability and he chooses to enforce his half of it, then you can deal with it. But I don't—that's way beyond anything I can deal with here and I don't want to kick the door open to what could be a very legitimate set of issues raised by the defendants here about how that agreement plays into this case. I think its just going to add way more complexity to this case than is worthwhile.

On December 1, 2003, the written assignment signed by Palmquist was submitted by Totaro along with her proposed findings of fact and conclusions of law. In her proposed findings Totaro requested the court find that Palmquist wanted Totaro to have his half of the overriding royalties and that he had expressly rejected a continuing interest in the royalties in favor of Totaro.

The trial court issued its decision on February 6, 2004. The court ruled that Totaro could recover only half of the overriding royalties, but did not mention Totaro's claim that Palmquist had assigned or relinquished his interest to her.

On April 21, 2004, Totaro moved for permission to file an amended or supplemental complaint adding an allegation that Palmquist had assigned his royalty interest to Totaro. This motion was opposed on untimeliness grounds. The court denied the motion, ruling that "it raises a new issue that could and should have been raised long before trial." The court stated:

> Plaintiff initially alleged that Mr. Nelson and Mr. Palmquist agreed that the assignment was to pay off a debt, and that once the debt was paid, the royalties would all revert to Ms. Totaro. According to the plaintiff, the new allegation essentially adopts this approach because Mr. Palmquist has now assigned to her any claim he had to the royalties. The problem with this claim is that there was no limitation on the face of the assignment—Mr. Palmquist was entitled to the royalties for as long as they would be paid. And the assignment which forms the basis of the amendment only was granted long after this case commenced. The amended complaint therefore does not conform the complaint to the evidence.

In her arguments to this court Totaro notes that her complaint alleged the overriding royalties assigned to Palmquist either had or soon would go to her. She argues that she proved this allegation through Palmquist's testimony that she should have his half of the overriding royalties. She contends that no real issue was made as to the effect of Palmquist's testimony and AAA's defense was simply that she was not entitled to any royalties at all. Totaro also notes that neither AAA nor Ramirez ever claimed Palmquist was a necessary or indispensable party.

In response AAA first argues that Totaro ratified Cosmos's assignment of half of the overriding royalties to Palmquist. But this argument does not address Totaro's contention that Palmquist reassigned his overriding royalty interest to her. AAA also argues that the trial court correctly refused to grant Totaro's post-decision motion to amend the complaint, quoting the court's conclusion that "[p]laintiff could have worked out an arrangement with Mr. Palmquist long before trial, but she chose not to do so. What plaintiff cannot now do is see[k] to amend the complaint to cure a legal deficiency through a back door, when she lost the argument at trial."

█ The trial court's reference to Totaro's failure to work out an arrangement with Palmquist before trial is clearly erroneous. Palmquist testified that prior to trial he told Totaro she could have his interest and at trial he confirmed this intent. We fail to see why this testimony was not an effective assignment of his interest to Totaro. Oral assignments are legally effective and no special form of words is required, so long as "the transfer is clearly intended as a present assignment of the interest held by the assignor." [34] Here Palmquist's intent was clear and the parties have never questioned it, either at trial or in this court. Further, if the statute of frauds generally requires a writing to transfer royalty interests in real estate, it is satisfied by Palmquist's testimony in open court that he told Totaro that she could have his interest.[35] We therefore conclude that it was error not to acknowledge Totaro as the proper recipient of all of the overriding royalty.

## B. The Trial Court's Description of the Lease's Termination Date

In its findings of fact the trial court stated: The lease contained provisions consistent with Mr. Ramirez's testimony that the purpose of the agreement was to level the property for future subdivision purposes. According to Mr. Ramirez, Mr. Nelson told him that it would take only 10 to 12 years to remove the gravel. The lease itself, however, stated that it would remain in effect for as long as it was economically feasible to take gravel from the property. As discussed below, the court finds that the lease did not expire after 10 or 12 years; rather, the parties intended that it *expire either when mining was no longer economically feasible or when the property was suitable for residential development, whichever came first.* (Emphasis added.)

Totaro argues that the trial court's finding that the lease would terminate when the property was suitable for residential development "should be recognized as dicta and of no binding consequence." Totaro observes that "[a]t this point in time it is unknown whether any dispute will ever rise between the parties over the appropriate time to terminate gravel [extraction] and to embark upon a subdivision." Totaro's basic contention seems to be that the interplay between the "mining no longer economically feasible" and "suitable for residential development" criteria was not litigated and therefore should be considered dicta.

AAA contends that "the [enforceabililty] of the Cosmos[/]Ramirez lease, including its term, was fully litigated at trial." AAA also observes that the Ramirez/Cosmos lease was correctly found by the court not to be an integrated contract and therefore the court properly considered extrinsic evidence as to when it should terminate.

The exact meaning of the "suitable for residential development" alternative termination date may be unclear. Nor was it the focus of this litigation. The final judgment does not mention the phrase, but simply states that the Cosmos/AAA sublease shall be specifically performed "until it is terminated by its terms or by agreement of parties." While the court may not have facially erred in expressing the termination dates as it did, the court's expression is not binding and questions as to the termination criteria will have to be resolved in the future.

## C. The Trial Court's Allowance of AAA's Royalty Deduction for Additives

█ Totaro claims that the trial court erred when it allowed AAA to reduce "weight ticket amounts to recognize additives of oil and sand to its asphalt products." This was a deviation from the strict terms of the contract, which provided:

3. Lessor will be paid Fifty Cents ($.50) per ton by the 15th of each calendar month for any processed material sold in the preceding month.

---

**34.** *Andersen v. Edwards,* 625 P.2d 282, 290–91 (Alaska 1981).

**35.** *See* AS 09.25.010(a)(6) and (b) and AS 09.25.020(4) (signed writing is required to transfer an interest in real property, but if the transferor admits the transfer in court, the transfer is enforceable).

. . . .

5. Lessor will be paid Ten Cents ($.10) per ton by the 15th of each month for any pit run material sold during the preceding month.

. . . .

13. Since all materials will be weighed when leaving the pit the tonnage will be converted to yards using an established conversion of 1.6 tons per yard, with no restrictions on minimum or maximum tons to be extracted, processed or sold. Accumulated weight tickets will be the basis of payment.

AAA presented a verified statement of royalties and an affidavit explaining the basis of the calculations. Based on those documents and AAA's testimony at the damages evidentiary hearing, the trial court determined that Totaro was entitled to receive royalties only on the weight of the product produced at the pit, not including the weight of additives to the product used to convert gravel to asphalt. This entitled AAA to a reduction in royalties of up to sixteen percent.

The trial court arrived at this calculation because it found that at the time of the original contract, in 1984, none of the parties contemplated that the pit would eventually produce asphalt.[36] In 1984 gravel was the principal product of the pit. As the trial court found:

[T]his all re[v]olves around the contract. The contract was a gravel lease contract. The royalty payments were for processed material, so I have to interpret what the parties intended by the phrase processed material. Because it was a gravel contract, they were thinking gravel.

The trial court based this ruling in large part on the oral testimony during the damages hearing and throughout the course of the trial. It is well settled that "[w]e give particular deference to the trial court's factual findings when, as here, they are based

primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence."[37] We are unable to say that the court's findings in this respect are clearly erroneous, and therefore they will be upheld.

## VI. CONCLUSION

For these reasons we VACATE the final judgment entered by the trial court and remand for further proceedings consistent with this opinion.

FABE, Chief Justice, with whom CARPENETI, Justice, joins, concurring in part and dissenting in part.

MATTHEWS, Justice, with whom EASTAUGH, Justice, joins, concurring in part and dissenting in part.

As the superior court acknowledged, the Ramirez/Cosmos gravel lease had "a host of deficiencies" including "a relatively indefinite term" and a "lack of a legal description or any description of the property to be mined." Most importantly, the Ramirez/Cosmos lease lacked any language whatsoever regarding the exclusivity of Cosmos's mining right. Yet the court concludes that the hopelessly deficient Ramirez/Cosmos lease could potentially support a result that would require AAA to pay Totaro royalties on behalf of a now-defunct corporation for the remainder of the useful life of AAA's gravel pit, with AAA never having the right to mine gravel on its property as the owner.[1] Because the Ramirez/Cosmos lease cannot possibly sustain such a highly restrictive, multi-decade arrangement, I do not believe a remand is necessary and would simply reverse the superior court's decision holding AAA liable to Totaro. But because I agree with the court that this decision cannot be affirmed as it stands, I agree that if it is not reversed outright, it must be remanded.

I share the court's view that "AAA's potential liability to Totaro turns on whether the Ramirez/Cosmos lease was intended to be an

---

**36.** The production of asphalt involves blending oil and other materials with gravel.

**37.** *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007).

**1.** At 160–63.

exclusive lease."[2] The Ramirez/Cosmos lease does not include any provision stating that Cosmos had the exclusive right to mine gravel on the property.[3] Totaro's interest in the gravel pit could best be characterized as an overriding royalty interest.[4] This interest was enforceable[5] but was tied to the terms of the lease and sublease out of which it was carved.[6] When AAA purchased Ramirez's property, it purchased Ramirez's right to mine gravel on the property as owner rather than as a sublessee of Cosmos with an obligation to pay royalties to Totaro.[7]

The court asserts that "some of [the Ramirez/Cosmos lease's] provisions may make sense only if the lease had been intended to be exclusive" and thus that the lease is "ambiguous on its face as to exclusivity."[8] But the subtle suggestions of exclusivity that the court points to in the lease's word choice,[9] such as the reference to Cosmos as the "pit operator," are not sufficient to create ambiguity regarding the existence of such a crucially important restriction in a lease that is otherwise completely silent on the matter. And the fact that the lease contemplated that Cosmos would make certain investments in the property in order to extract gravel does not in and of itself create ambiguity regarding exclusivity simply because it casts doubt on the wisdom of Cosmos's entering into a nonexclusive leasing arrangement.[10]

Ambiguity in a contract does not arise from silence.[11] And unambiguous contract

2. *Id.* at 160.

3. Indeed, J.B. McCombs, the attorney AAA retained to review the Ramirez/Cosmos lease, noted that the lease was problematic because it lacked an exclusivity provision:

   One major problem with this Agreement is that it does not state that this is an exclusive agreement with Mr. Ramirez. Under this agreement, there is a very good argument that he could execute a similar, non-exclusive agreement with another party for this same property. That other party could then access the property and mine gravel on a different portion of this same land. The agreement should clearly state that this is an exclusive right to mine gravel from this property.

4. *See Allen v. Alaska Oil & Gas Conservation Comm'n,* 1 P.3d 699, 700 n. 1 (Alaska 2000) ("[A]n overriding royalty interest is 'a percentage of the gross production payable to some person other than the lessor or persons claiming under the lessor.'" (quoting 38 Am.Jur.2d *Gas and Oil* § 215 (1999)).

5. As the holder of an overriding royalty interest, she held a "share of . . . revenue from production . . . carved out of a lessee's interest" under the gravel pit lease. Black's Law Dictionary 1356 (8th ed.2004).

6. *See* 38 Am.Jur 2d *Gas and Oil* § 217 (1999) ("An overriding royalty interest is subject to the terms of the lease upon which it is founded, so generally, when the lease terminates, either by its own terms or in some other regular manner consistent with good faith, the royalty itself comes to an end."); Black's Law Dictionary 1356 (8th ed. 2004) ("An overriding-royalty interest ends when the underlying lease terminates."). Arguably, when Cosmos dissolved for a second and final time in 1992 declaring "no assets of the corporation to distribute to shareholders or to be applied toward the corporation's debts and liabilities,"

the company effectively abandoned the leases. In that case, Totaro may be left with no basis on which to claim any continued interest in the pit. *See* 38 Am.Jur.2d *Gas and Oil* § 217; *Ridge Oil Co. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 155 (Tex.2004) (noting that an overriding royalty interest is a nonparticipating interest, which means that the royalty owner is wholly dependent on the lessee to keep the lease alive).

7. While there is a general rule that a tenant is estopped from challenging his landlord's title as long as he remains undisturbed in his possession of the property, even if he himself purchases a title to the property that is superior to his landlord's title, this rule only applies where the tenant asserts a title that is "inconsistent with the idea that at the time the tenant took possession, the landlord had the title which was recognized between them." 49 Am.Jur.2d *Landlord and Tenant* § 768 (2006); *see id.* §§ 764, 778 (explaining the general rule). AAA does not assert a title that is inconsistent with Cosmos's title under the Ramirez/Cosmos lease—if Ramirez had always retained the right to mine the property as the owner, AAA's assertion of that right as Ramirez's successor in interest is not inconsistent with Cosmos's title under the Ramirez/Cosmos lease.

8. At 160.

9. *Id.* at 161–62, note 16.

10. The "extrinsic evidence" of exclusivity that the court points to—indirect inferences from Ramirez's word choice in an affidavit written almost two decades after the lease was drafted—is similarly unpersuasive. *Id.* at 161–62.

11. *See* 17A Am.Jur.2d *Contracts* § 331 (2004) ("Ambiguity in a written agreement does not arise from silence, but from what was written so blindly and imperfectly that its meaning is doubtful.").

language is not rendered ambiguous simply because the parties disagree on their intent at the time of contracting, because they advance different interpretations during the course of litigation, or because the clear meaning of the language used would work a hardship on one of the parties.[12] By omitting any mention of exclusivity, Ramirez retained a concurrent right to mine the gravel on his property. Indeed, its attorney, McCombs, warned AAA that Ramirez could have "execute[d] a similar, non-exclusive agreement with another party for th[e] same property."

The evidence in the record suggests that the uncertainty surrounding the parties' leasing arrangement is precisely what roused AAA to action when Ramirez put the property up for sale. Fuger testified that he was concerned that the Ramirez/Cosmos lease was "real spooky," and "questionable at best." And the evidence leaves no doubt that AAA had ample cause for concern. Recognizing its vulnerability to the whims of a new owner, AAA bought the gravel pit for itself. Just as Ramirez had the right to mine the gravel pit as fee simple owner, unencumbered by the lease with Cosmos, so too did AAA enjoy the full panoply of ownership rights after the sale. When AAA secured the right to mine the pit as its owner, its obligation to pay royalties to Totaro as a sublessee ended. AAA might have discussed its plans to exercise a concurrent mining right with its former sublessor Cosmos, but Cosmos no longer existed. Accordingly, I believe the superior court erred in ruling that AAA owes royalties to Totaro under the sublease.

Because I would not require AAA to continue to pay royalties to Totaro, I would not reach the question whether Ramirez should be held liable to AAA for breach of the covenant against encumbrances under the warranty deed by which he sold AAA the property. Nonetheless I agree that if AAA is held liable to Totaro for royalties under the gravel leases, then Ramirez, who sold AAA a warranty deed with no exceptions to title, must be held liable to AAA for breach of warranty. A grantor should not be allowed to avoid the clear obligations of a warranty deed by asserting that the grantee knew or should have known of an encumbrance against title, particularly where, as here, the purchase price for the property does not reflect the encumbrance.

For these reasons, I respectfully dissent from part IV.A.2 of the per curiam opinion.

MATTHEWS, Justice, with whom EASTAUGH, Justice, joins, concurring in part and dissenting in part.

I would affirm the superior court's ruling that AAA remains liable to pay royalties to Totaro and thus disagree with the per curiam opinion that a remand is necessary to determine whether the Ramirez/Cosmos lease was exclusive. I also would affirm the superior court's ruling that the implied covenant against encumbrances inherent in the warranty deed under which Ramirez conveyed title to AAA did not shift to Ramirez AAA's obligation to pay such royalties. I thus disagree with parts IV.A.2 and IV.B of the per curiam opinion, but agree with parts IV.A.1 and V.

## EXCLUSIVITY

At the outset of the trial the superior court offered the parties a hypothetical example under which A, the owner, "leases the pit to B, B turns around and leases the pit to C." Under the first lease "B was going to pay A two cents a ton" and under the second lease "C was going to pay B 2–1/2 cents a ton." "C now buys the pit. My question is doesn't C still owe B half a cent a ton?" After some discussion counsel for all three parties

---

**12.** *See Peterson v. Wirum,* 625 P.2d 866, 870 (Alaska 1981) ("Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative. Rather, the court must look to express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement." (footnote omitted)); 17A AM.JUR.2D *Contracts* §§ 330–331 (2004) (explaining that unambiguous contract language does not become ambiguous because competing interpretations of it are presented during litigation or because implementing it would inflict hardship on a party).

agreed that C's obligation to pay a royalty to B would not be extinguished by C's acquisition of A's ownership interest so long as the leases were valid and had not expired. In accordance with this example, the court at the end of the trial found that both leases were valid and had not expired and therefore AAA was not relieved of its duty to continue making overriding royalty payments to Totaro.

AAA contends, notwithstanding this colloquy, that it no longer owes overriding royalties under the Cosmos/AAA lease because the Ramirez/Cosmos lease was not exclusive and AAA as owner is entitled to exercise Ramirez's retained right to extract gravel directly. I think that this argument lacks merit for three reasons.

**1.** First, there is no persuasive evidence that the Ramirez/Cosmos lease was not exclusive. AAA in its brief contends that Ramirez "allowed other gravel operators such as Northland [sic] Steel to mine gravel on the property at the same time Cosmos was operating." It also contends that "Ramirez always retained the right to extract gravel on his land directly or through permission granted to other operators."

As authority for the first proposition AAA cites the court's finding that

[f]our or five months after signing the agreement with Mr. Ramirez, Mr. Nelson opened negotiations with Mr. Fuger, an employee of Mr. Nelson who was working in the Ramirez pit, and Ken Mearkle, an independent gravel operator working under the business name of Northland [sic] Steel, which in turn was working in the Ramirez pit at the same time as Cosmos.

AAA interprets this as a finding that Mearkle/Northern Steel was operating in the pit under permission granted by Ramirez rather than permission granted by Nelson. But the court did not so find. Nor would the evidence have justified such a finding, because both Mearkle and Fuger testified that Northern Steel was working in the pit under an arrangement made with Nelson.[1]

AAA also cites Ramirez's testimony for the proposition that he retained the right to extract gravel. But Ramirez merely testified that he had no discussions with Nelson as to exclusivity. Ramirez also testified that he did not recall an agreement with Mearkle's company for gravel extraction. The colloquy went as follows:

Q: [by Ramirez's counsel] Did you have an agreement with Mr. Mearkle's company for gravel extraction?

A: Not that I recall.

Q: Did Mr. Mearkle pay you royalties, do you recall?

A: Well I didn't remember but I think you said—I believe it was one or three—I don't how many checks he sent, one or two or three, I don't remember.

Q: I'm sorry.

A: I don't recall the checks. I know I think I got some, but I don't recall, you know, how many or . . . . .

Q: Oh, you got checks from Northern . . . . .

A: I believe so.

Given that Nelson's subsequent arrangement with AAA was that AAA would pay Ramirez directly, the fact that Ramirez received checks from Northern Steel is not inconsistent with Mearkle and Fuger's testimony that Northern Steel was working at the pit under Nelson's auspices.

As noted in the per curiam opinion, there is a considerable body of evidence that indicates that the lease was intended to be exclusive.[2] To reiterate this briefly, Ramirez stated that "[i]n 1984, I advertised in the newspapers *for someone to develop my property into gravel pit.*" (Emphasis added.) And when Nelson responded, again according to Ramirez, "we entered into letter of intent concerning the development of the pit." Ramirez consistently refers to the "pit" in the singular, noting that Cosmos was to manage it and that Ramirez would either help to manage the pit or take a five-cent-per-yard price reduction. Ramirez states

**1.** Mearkle Depo. 41–42, 50–51, 54–55, 144, 166–67 (in the record beginning at 645, vol. II of the record); R. 554 (p. 15), 596 (pp. 168–69).

**2.** *See* At 161–62 n. 16 and 161–62.

that Fuger of AAA took over running the pit and "ran the pit" from 1985 through August 1998 when Ramirez sold the pit to AAA. As the per curiam opinion notes, Ramirez's statements imply exclusivity.[3]

Further, the Ramirez/Cosmos lease contains terms that show that the parties to the lease intended the lease to be exclusive. For example, as the per curiam opinion also notes,

> Cosmos is referred to as the "operator" or "pit operator." Cosmos assumed pit-wide responsibilities regarding slope preparation as the pit recedes and undertook the responsibility to dig test holes for the owner's benefit every 1,000 feet. The lease contemplated that Cosmos would build a bridge to get better access to the gravel and would build a large washing and separation plant on the property." [4]

In my view it would be inconsistent with these lease terms to conclude that Ramirez could sell gravel from the pit independent of the lease. Cosmos can hardly have been expected to improve the pit to facilitate its exploitation by other operators.

2. Second, the question is not simply one of nonexclusivity, but whether Ramirez retained the right to permit another large-scale gravel extraction operation. We can assume for purposes of argument that Ramirez retained the right to allow contractors to take occasional loads of gravel from the pit. The exercise of such a right would not necessarily have substantially interfered with the high volume operations contemplated and conducted under the Ramirez/Cosmos lease. But large-scale alternative operations—operations comparable to those being conducted under the lease by AAA—clearly would have conflicted with the Ramirez/ Cosmos lease.[5] Again, Cosmos' pit-wide duties regarding slope preparation, test holes, and access improvement would not have been undertaken if the pit could be mined by another large operator. It follows that if Ramirez retained the right to mine or permit mining on an occasional basis free from the Cosmos lease

he could transfer that right to a buyer. But he could not transfer a right to conduct large-volume operations, because he did not retain such a right.

Here AAA claims the right to conduct its operations as Ramirez's transferee exactly— in terms of both volume and location in the pit—as it had conducted them as lessee. There is no evidence that AAA's operations in the pit changed on and after August 26— when AAA became the pit owner—from what they were on August 25, 1998, and before— when AAA was Cosmos's lessee. For AAA to prevail on its argument that it is now exercising Ramirez's retained extraction rights, it would have to show not only that the Ramirez/Cosmos lease was not exclusive, but that Ramirez retained the right to permit another gravel operation in the pit comparable in size to, and side by side with, that contemplated and exercised under the auspices of the Ramirez/Cosmos lease. Because no such showing has been or can be made, AAA's argument fails.

3. Third, even if we assume that the Ramirez/Cosmos lease is not exclusive and further assume that it would not preclude Ramirez from entering into another lease with a large-scale operator, AAA could not have made such an arrangement with Ramirez without breaching the Cosmos/AAA lease. The Cosmos/AAA lease was explicitly exclusive and expressly required AAA to "take all reasonable steps to protect" Cosmos's lease with Ramirez. If AAA had contracted directly with Ramirez to take all its gravel from Ramirez, such a contract rather than protecting the Ramirez/Cosmos lease would have rendered it without value. Because of the exclusive nature of the Cosmos/AAA lease, Cosmos was precluded from extracting gravel on its own, or permitting another operator to do so. Therefore AAA's hypothesized separate direct arrangement with Ramirez would have left Cosmos without a potential revenue source under its lease with Ramirez. Such an action would not be consistent with AAA's obligation to protect the

---

3. At 161–62.

4. At 161–62 n. 16.

5. The conflict would be even more obvious if the alternative operations took place in the same area of the pit as operations under the Ramirez/Cosmos lease.

value of Cosmos's interest in the gravel operation.

For these reasons, I would affirm the superior court's rejection of AAA's argument that it freed itself from its obligation to pay royalties under the Cosmos/AAA lease when it purchased Ramirez's interest in the property.[6]

## THE IMPLIED COVENANT AGAINST ENCUMBRANCES

AAA argues that Ramirez should indemnify AAA for the royalties that AAA owes Totaro because Ramirez conveyed the property to AAA under a warranty deed. AAA notes that a standard warranty deed such as was given here contains an implied covenant against encumbrances, and argues that Totaro's overriding royalty right arising from the Cosmos/AAA lease is an encumbrance covered by the implied covenant. AAA contends that its knowledge of the encumbrance should not exclude it from the protection of the covenant. AAA also argues that there is no ground for finding a waiver of its covenant rights.

Today's per curiam opinion largely accepts AAA's arguments. According to the per curiam opinion, "[t]he intention to exclude an encumbrance should be manifested in the deed itself, for a resort to oral or other extraneous evidence would violate settled principles of law in regard to deeds."[7] The superior court's decision reflects a less absolute and, in my opinion, more accurate view of the law concerning encumbrances than that accepted by the per curiam opinion.

The superior court initially ruled on the covenant against encumbrances issue on the parties' cross-motions for summary judgment.[8] The court ruled at the outset that the Cosmos/Ramirez lease was an encumbrance.[9] This led to the question "whether a grantee can bring an action for breach of a statutory warranty when it knew or should have known about the encumbrance upon which the action for breach is based."[10] The court recognized the general rule that knowledge of an encumbrance on the part of a purchaser does not bar its claim, but noted two exceptions.[11] The first would apply if there were "physical conditions of the land itself which were apparent on inspection and which are found to have been 'within the contemplation of the parties in agreeing on the purchase price.'"[12] The second would apply if "the grantee knew of the encumbrance and agreed to the conveyance with the encumbrance intact."[13] As authority for the first exception the court relied on *Tabet Lumber Co. v. Golightly*,[14] which in turn was

6. In 1998 when AAA purchased the property from Ramirez, it was concerned that he would sell the property to a third party free from the lease. But the circumstances under which a tenant may breach a lease because of the threat that a paramount title will be asserted are limited. Generally a tenant is precluded from terminating a lease based on a mere assertion of paramount title by a third party; a tenant is justified in attorning to a new owner only if the new owner actually has paramount title that entitles him to oust the tenant from the possession of the leased property. *See* RESTATEMENT (SECOND) OF PROPERTY: LANDLORD & TENANT § 4.3 & cmt. b (1977). In the present case, a claim by a third-party purchaser that his title was not subject to the unrecorded lease and sublease would be hard to maintain since purchasers have a duty to inquire of the possessors of the land they buy as to the authority under which they hold. *See Methonen v. Stone*, 941 P.2d 1248, 1252 (Alaska 1997) ("It is well established that a purchaser will be charged with notice of an interest adverse to his title when he is aware of facts which would lead a reasonably prudent person to a course of investigation which, properly executed, would lead to knowledge of the servitude. The purchaser is considered apprised of those facts obvious from an inspection of the property. Lack of diligence in the prosecution of a required inquiry creates a conclusive presumption of knowledge of those facts which reasonable inquiry would have revealed.") (footnote and citations omitted).

7. At 163 n. 25 (quoting *Jones v. Grow Inv. & Mortgage Co.*, 11 Utah 2d 326, 358 P.2d 909, 911 (1961)).

8. The full text of Judge Smith's summary judgment ruling on this issue is set out in Appendix A.

9. App. A at 178–79.

10. *Id.* at 178–79.

11. *Id.* at 179.

12. *Id.* at 179.

13. *Id.*

14. 80 N.M. 442, 457 P.2d 374, 375 (1969).

based on Powell, The Law of Real Property § 907, at 268.21 (1968).[15] The second exception was based on Powell, Powell on Real Property § 81A.06[3] (1999).[16]

The court identified four material issues which would be relevant to a determination as to whether the exceptions applied. The issues identified by the court were (1) whether the parties knew about the Cosmos/Ramirez lease when AAA purchased the property, (2) whether the lease infringed on the title itself, (3) whether the lease involved physical facts concerning the premises,[17] and (4) the intent of the parties, in particular whether AAA was willing to purchase the property notwithstanding the encumbrance.[18] Focusing in particular on the "issue of the parties' intent" the court held that a trial was needed on AAA's covenant-based claim.[19]

At the trial the court addressed and resolved the issues that it had identified in its summary judgment ruling. The court made detailed findings of fact and discussed and integrated its findings in its conclusions of law.[20]

The court began its conclusions of law discussion by referring to its summary judgment ruling. The court reiterated the general rule that a purchaser's knowledge of an encumbrance will not ordinarily suffice to defeat the purchaser's claim under a covenant against encumbrances.[21] The court again noted two exceptions under which a claim on a covenant would be defeated, namely, (1) where physical conditions on the land are apparent on inspection and affect the purchase price and (2) where the grantee knows of the encumbrance and the parties act in a manner reflecting a waiver of any

claim of breach by the grantee.[22] The court then referred to the four material issues that it had identified in its summary judgment ruling: (1) whether the parties knew of the encumbrance; (2) whether the lease infringed on the title itself; (3) whether the lease involved physical facts concerning the property; and (4) whether the parties acted in a manner that reflected an intent by AAA to proceed notwithstanding the encumbrance.[23] The court noted that the infringement issue was a legal issue, observing that "the court has found that the lease infringed on title," and proceeded to discuss the other three issues in light of the evidence presented at the trial.[24]

Concerning knowledge of the lease, the court found that both parties "knew about both the Cosmos/Ramirez lease and the Cosmos/AAA lease when they negotiated and arrived at the land sale agreement."[25] The court concluded that in light of this knowledge, "neither party could reasonably have relied upon any alleged misrepresentation by the other party."[26]

Concerning the physical condition issue, the court concluded that contrary to its summary judgment ruling, "the physical condition" exception applied.[27] The court stated:

> The evidence at trial indicated that the gravel mining operations were obvious to any casual observer and that it was clear that AAA was conducting the mining operations. It is self-evident that the gravel mine was the principal basis for the purchase price.... The evidence indicated that the operations and lease were tied together in the minds of the parties and

15. App. A at 179.

16. *Id.* at 179.

17. The court in this initial ruling indicated that the first exception would not apply because of the lack of an "intrinsic tie between the lease and the [gravel] operation." App. A at 180.

18. *Id.* at 179–80.

19. *Id.*

20. The court's findings of fact and conclusions of law with respect to the covenant issue are set out in Appendix B.

21. App. B at 181–82.

22. *Id.*

23. *Id.* at 180.

24. *Id.*

25. App. B at 182–83.

26. *Id.* at 183.

27. *Id.*

that any person who inspected the property would have been on notice that someone other than the owner was mining the gravel. The court accordingly concludes that there were physical features on the land which gave notice of the encumbrance and were within the contemplation of the parties when they negotiated the sale.[28]

Concerning the issue of the parties' intent, the court had earlier found that the parties had mutually decided that the sale transaction would be independent of whatever consequences might flow from the Cosmos/AAA lease: "Mr. Fuger and Mr. Ramirez were well aware of the leases at issue and ... they decided not to deal with the ramifications of the sale on the Cosmos/AAA lease." [29] In line with this finding the court determined that the parties had discussed "whether royalties would have to be paid under the two leases and whether the Cosmos/AAA lease would remain in effect once the property were sold." [30] The court found that notwithstanding concerns that it would still have to pay royalties to Totaro "AAA decided to purchase the property." [31] The court found that

> [w]hile there is no direct evidence that the legal uncertainties affected the purchase price, the court has no doubt that AAA carefully evaluated the relative costs and benefits of proceeding and decided that it was best to proceed and to run the risk

that AAA would be held liable under the Cosmos/AAA lease.[32]

The court also found that

> AAA would have purchased the property even if it knew for a fact that it had to keep paying royalties to Ms. Totaro; for AAA had been paying her and Mr. Ramirez royalties for many years, and by purchasing the property AAA would be increasing its future revenue stream since it would no longer have to pay Mr. Ramirez.[33]

In accordance with these findings the court concluded that the second exception also applied: AAA knew of its potential obligation to pay royalties to Totaro and agreed to proceed with the sale knowing that Ramirez had not agreed to assume any responsibility concerning this potential obligation.[34]

The court's findings are reviewed on appeal under the deferential clearly erroneous standard. They clearly pass muster under this standard for they are all based either on direct evidence or permissible inferences from the evidence.

The real difference between the superior court's position and that of today's per curiam opinion appears to be rooted in a conflict of legal precedents. While the two exceptions relied on by the superior court are well supported by case law,[35] there are also

28. *Id.*

29. *Id.* at 180–81.

30. *Id.* at 183.

31. *Id.*

32. *Id.*

33. *Id.* at 183–84.

34. *See* App. B. "During ... negotiations, Mr. Fuger and Mr. Ramirez discussed the impact of the sale on the ... Cosmos/AAA lease[.]" *Id.* at 180. They ultimately "decided not to deal with the ramifications of the sale on the Cosmos/AAA lease." *Id.* at 181.

35. Regarding obvious physical conditions on the land, *see, e.g., Marathon Builders, Inc. v. Polinger,* 263 Md. 410, 283 A.2d 617, 621 (1971) (easements that are "readily apparent upon an inspection of the property, such as a public road in use upon the land," do not breach the covenant

against encumbrances because the parties are deemed to have contracted with knowledge of the encumbrance, and adjusted the price accordingly); *Tabet Lumber Co. v. Golightly,* 80 N.M. 442, 457 P.2d 374, 375–76 (1969) (covenant against encumbrances does not cover "physical conditions of the land itself which were apparent on inspection and which are found to have been within the contemplation of the parties in agreeing on the purchase price" (quoting 6 POWELL, THE LAW OF REAL PROPERTY § 907, at 268.21 (1968)) (internal quotation marks omitted)); *McKnight v. Cagle,* 76 N.C.App. 59, 331 S.E.2d 707, 712 (1985) (remanding for factual finding on purchaser's knowledge of easement for public highway in claim for breach of warranty against encumbrances, as such an easement constitutes breach only "where the purchaser has no actual or constructive knowledge of the encumbrance at the time of the purchase"); *Hawks v. Brindle,* 51 N.C.App. 19, 275 S.E.2d 277 (1981) (reversing grant of summary judgment in seller's favor on purchaser's claim that public right-of-way breached warranty against encumbrances, and

authorities taking the strict view reflected by the per curiam opinion.[36]

In my opinion the exceptions represent better law. The per curiam opinion explains its strict approach on the ground that title covenants inherent in warranty deeds "provide certainty and predictability in property transactions."[37] But in contemporary transactions title covenants have little to do with certainty and predictability. A quitclaim, or bargain and sale, deed will provide a title that is as certain and predictable as a warranty deed.[38] Assurance that a title is good is typically provided by a professional title insurance company based on title insurance that is issued only after the title company makes a careful examination of recorded title documents.[39] The covenant against encumbrances inherent in a warranty deed simply reflects a personal contract of indemnity in which the seller agrees to indemnify the buyer against losses the buyer may suffer by reason of defects or encumbrances.[40] Most

remanding for trial because there was issue of fact as to whether the purchaser had actual knowledge of the encumbrance) ("The parties are taken to have contracted with reference to the existence of a burden of which they were fully aware." (quoting *Tise v. Whitaker Harvey Co.*, 144 N.C. 507, 57 S.E. 210, 212 (1907))); *Somers v. Leiser*, 43 Wash.2d 66, 259 P.2d 843, 844 (1953) (affirming a holding that easement for a graveled public roadway did not breach the covenant against encumbrances because "a provision in a contract to convey real estate 'free of encumbrances' does not refer to granted easements, permanent in character, which are either known to a vendee, or the existence of which he should have known or ascertained had he made a reasonable investigation."); *Merch. Corp. v. Marine Nat'l Exch. Bank*, 12 Wis.2d 79, 106 N.W.2d 317, 320 (1961) (where purchaser had actual knowledge of third party's "open, notorious, [and] continuous" use of easement prior to purchase, "the purchaser cannot maintain an action for the breach of the covenants of seizin and against [encumbrances]").

Regarding intent of the parties not to cover a particular encumbrance, *see, e.g., Alumni Ass'n of Univ. of North Dakota v. Hart Agency, Inc.*, 283 N.W.2d 119, 121–22 (N.D.1979) (covenant against encumbrances not breached by outstanding lease because parties had knowledge of the lease and "contemplated its existence in negotiating the price"); *Klarfeld v. Reil*, 281 A.D. 715, 117 N.Y.S.2d 785, 786 (N.Y.App.Div.1952) (leases did not violate covenant against encumbrances where circumstances showed that parties intended the purchaser would "take title subject to [the leases]"); *Hagelin v. Lehmann*, 100 N.J.L. 322, 126 A. 431, 431–32 (1924) (reversing a judgment in favor of purchaser on breach of covenant against encumbrances claim where alleged encumbrance was lease that purchaser had knowledge of, and the contract apportioned rent from the lease).

36. *See, e.g.*, 3 AMERICAN LAW OF PROPERTY § 12.128 (reprint 1974) (A. James Casner ed., 1952) ("Nor, of course, is the covenant broken by the existence of an encumbrance excepted therefrom or assumed by the grantee, even when it appears when this is done by parol agreement. Ordinarily, however, mere knowledge that an encumbrance exists will not amount to an implied exception from the covenant, although *this has been held both to be the case and not to be the case in respect to a lease under which the tenant was in possession.*" (emphasis added) (footnote omitted) (citing case authority)).

37. At 164.

38. *See, e.g., United States v. Speidel*, 562 F.2d 1129, 1132 (8th Cir.1977) ("Under Iowa law a quitclaim is as effective to transfer title to realty as any other form of conveyance." (citing *Swab v. Appanoose Country Club*, 203 N.W.2d 318, 319 (Iowa, 1972))); *Rust Land & Lumber Co. v. Wheeler*, 189 F. 321, 325 (8th Cir.1911) ("[I]n Arkansas, [a quitclaim deed] is as effectual to convey the estate of a grantor as a deed with full covenants of warranty ...." (citing *Bagley v. Fletcher*, 44 Ark. 153 (Ark.1884))); *Suman Corp. v. Warren*, 553 So.2d 1123, 1127 (Miss.1989) (Robertson, J., concurring) ("A quitclaim deed conveys title as effectively as a warranty deed." (citing *Owen v. Potts*, 149 Miss. 205, 115 So. 336, 338 (1928))); *Owen v. Potts*, 115 So. at 338 ("A quitclaim deed is as effectual to convey title as one with general warranty." (quoting *Chapman v. Sims*, 53 Miss. 154 (Miss.1876)) (internal quotation marks omitted) (upholding purchase by quitclaim deed over prior unrecorded purchase by warranty deed)).

39. "Where title insurance is used—written by substantial corporations compensated for their risk—there is little occasion for personal warranties." 2 MILTON R. FRIEDMAN & JAMES CHARLES SMITH, FRIEDMAN ON CONTRACTS AND CONVEYANCES OF REAL PROPERTY § 8:12, at 8–35 (7th ed.2009). *See also* 14 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 81A.06[1] (Michael Allan Wolf ed., 2009) (explaining that title insurance is replacing the "system of title covenants" that originated in England in the 17th century, a system that developed because it was then "[t]he only assurance that could be obtained" as to the validity of title, as "[t]itle records were virtually nonexistent"). Title insurance was provided in the sales transaction between Ramirez and AAA.

40. "A covenant of title which warrants that the premises are free from encumbrances is an

buyers pay little attention to the solvency of those from whom they purchase, preferring, understandably, to rely on professional title insurers. Given that title covenants are personal contracts of indemnity, it makes good sense to treat them as such.[41] Employing exceptions like those applied by the superior court tends to prevent title covenants from becoming traps for unwary sellers.[42] The exceptions are designed to ensure that a seller's indemnity obligation runs only to de-

fects and encumbrances that the parties to the transaction would reasonably expect to be covered.

This case is a good example of what can happen in the absence of some such approach. Here the buyer seeks indemnity from the seller for a contractual obligation that the buyer itself has incurred.[43] The seller has not participated in the creation of this obligation, but under today's per curiam decision he will be required to pay it.[44] The

agreement to indemnify the covenantee in the event that he or she suffers any loss to the value of the premises due to the existence of an encumbrance." 14 POWELL ON REAL PROPERTY, *supra* note 39, at § 81A.06[2][c][i]. *See also* 3 AMERICAN LAW OF PROPERTY, *supra* note 36, at § 12.128 (stating that the covenant against encumbrances "is [a] personal covenant").

41. Professor Casner suggests that covenants be construed as contracts:

Often the last paragraph of a deed is devoted to covenants of the grantor. They are not essential to the import of the instrument as a present conveyance. But they are helpful not only for whatever value they have as personal [guarantees] but as effecting a future transfer of any title or interest subsequently acquired by the covenantor. Although their inclusion in the prevailing form of conveyance gives to it the name of warranty deed, they could just as well be embodied in a separate contract. With the exception above noted, [after acquired title,] it is as a contract rather than as a conveyance that they are construed....

3 AMERICAN LAW OF PROPERTY, *supra* note 36, at § 12.50. *See also Taylor v. Holter*, 1 Mont. 688 (1872) ("The contract or covenant of warranty must be construed like any other contract by arriving at the intention of the parties...."); *Hampton v. Minton*, 785 S.W.2d 854, 859 (Tex. App.1990) ("Regardless of what label is assigned to the vendor's promise to pay holders of superior liens, be it a covenant of title or something else, the promise is still part of a contractual agreement and the instrument must be construed according to the rules of contract law.").

42. Friedman observes that knowledgeable sellers already shy away from giving warranty deeds: "Traditionally, most deeds have been full covenant and warranty, but there has long been a slow but steady trend against warranties, particularly in the larger cities. *Banks and lending institutions almost invariably refuse to give any warranties. A well-advised individual will do the same* ...." FRIEDMAN, *supra* note 39, at § 8:12[A] (emphasis added).

43. I am referring here to AAA's obligation to pay royalties to Totaro. AAA incurred this obligation in its lease with Cosmos which then assigned its royalty rights to Totaro. Notwithstanding the

per curiam opinion's contrary assertion (*see* 163 n. 23), Totaro's right to receive royalties from AAA is an encumbrance. Powell observes that

a covenant of title which warrants that the premises are free from encumbrances is an agreement to indemnify the covenantee in the event that he or she suffers any loss to the value of the premises due to the existence of an encumbrance. *An "encumbrance" is any right or interest existing in a third person which diminishes the value of the estate to the grantee*, but which is consistent with the passage of the estate to the grantee.

14 POWELL ON REAL PROPERTY, *supra* note 39, at § 81A.06[2][c][i] (emphasis added). Under this definition Totaro's right to receive royalties plainly qualifies as an encumbrance. Indeed, under the facts and circumstances of this case, it appears that the only encumbrance that diminishes the value of the property to AAA is Totaro's right to receive royalties.

44. Ramirez observes that "it would be a strange twist of events if this Court were to rule that Herman Ramirez is responsible to indemnify AAA for damages arising from a contract to which he was not a party." In my research I have uncovered no authority that suggests that the covenant against encumbrances reaches so far as to protect a grantee from its own contractual obligations. One case in which something close to this was attempted by a party and rejected by the court is *Alumni Association of the University of North Dakota v. Hart Agency, Inc.*, 283 N.W.2d 119 (N.D.1979). In that case, R.M. Hart obtained an option to buy property owned by the Alumni Association. The option contained a covenant against encumbrances but the property was leased to a bank of which Hart was president. Hart sought to justify his delay in paying the purchase price after exercising the option on the ground that the lease to the bank was an encumbrance governed by the covenant against encumbrances expressed in the option contract. The trial court held that the lease to the bank was not intended to be governed by the covenant. On appeal, the Supreme Court of North Dakota affirmed, concluding that "[i]t was not error for the trial court to conclude that title to the Prince Hotel Properties was merchantable and free of liens and encumbrances within the

obligation is a substantial one and the upshot of this case may be that the seller may be required to pay the whole amount of the sale proceeds to indemnify the buyer for the buyer's contractual obligation. This court should avoid choosing a line of authority that leads to a result that is so obviously contrary to the actual and reasonable expectations of the parties.

For these reasons I dissent from parts IV.A.2 and IV.B of the per curiam opinion.

### APPENDIX A—Excerpt from Superior Court's "Order on Motions for Summary Judgment" of June 2, 2003

*AAA/Ramirez claims*

There are two interrelated issues between AAA and Mr. Ramirez. AAA claims that if it is held liable for breach of contract, Mr. Ramirez must reimburse AAA because of his wrongful behavior in giving AAA a warranty that there were no encumbrances on the property, when in fact the property was subject to the potentially valid Cosmos/Ramirez lease. Mr. Ramirez asserts that he is entitled to summary judgment against AAA because AAA knew about that lease and hence has waived any claim it has against him.[2] The difficulty with both of these arguments is that there is a dispute as to the intention of the parties regarding whether AAA acceded to the encumbrance, and that dispute precludes summary judgment.

AAA rests its claim against Mr. Ramirez on its allegation that Mr. Ramirez breached the covenant against encumbrances. In particular, AAA asserts that Mr. Ramirez warranted in both the earnest money agreement and the statutory warranty deed that there were no encumbrances upon the property. According to AAA, plaintiff's breach of contract claim is predicated on the Cosmos/Ramirez lease; if that lease is found by the court to be valid, then the lease was an encumbrance upon the property, and hence Mr. Ramirez breached the warranties.

Mr. Ramirez responds that AAA knew about the Cosmos/Ramirez lease and so it has waived any claim of breach of the warranties. AAA does not directly deny that it knew about the lease, but it alleges that its knowledge is irrelevant, because the warranties apply notwithstanding actual or constructive knowledge of an encumbrance.

There are at least two distinct legal issues involved here. The first is whether the Cosmos/Ramirez lease is an "encumbrance" on the property. The parties agree that the lease must be valid in order to be an encumbrance; while neither party believes that the court will find the lease to be valid, they assume the lease's validity for purposes of assessing who would be liable to plaintiff should she prevail on that claim.

Mr. Ramirez suggests that the lease is not an encumbrance because AAA was not and has not been disturbed in its possession of the land due to the fact that Cosmos no longer exists as a corporate entity and so is not seeking to exercise its lease. But aside from the fact that Ms. Totaro has the right to seek to vindicate Cosmos' royalty rights, the case law simply does not support Mr. Ramirez's claim that a lessee must actually be dispossessed in some fashion for a lease to become an encumbrance. The general definition of encumbrance includes "leases" and "any right in a third party which diminishes the value or limits the use of the land granted." *Domer v. Sleeper*, 533 P.2d 9, 11 n. 5 (Alaska 1975). By granting rights to the gravel in the property, the Cosmos/Ramirez lease clearly both diminishes the value of the land and limits the land's use. More important, the case upon which Mr. Ramirez relies specifically contradicts his analysis:

contemplation of the parties to the option, even though an outstanding lease had not been cleared." *Id.* at 122.

**2.** Mr. Ramirez also claims if AAA is entitled to relief against him, the proper remedy is rescission, not damages, because AAA's claim against him rests upon an allegation that Mr. Fuger

acted under duress; and since a person acting under duress lacks capacity to contract, the appropriate relief is rescission, not damages. The court will not address this argument because AAA did not raise duress in its third party complaint or motion for summary judgment.

Since the lease is an encumbrance, a covenant against encumbrances is broken immediately upon making the covenant if a lease is then outstanding, although there has been no ouster by the lessee nor interference with the possession and use by the owner.

*Chicago, Mobile Devel. Co. v. G.C. Coggin Co.*, 259 Ala. 152, 66 So.2d 151, 155 (1953).

There accordingly is no question that the Cosmos/Ramirez lease is an encumbrance. This leads to the second legal issue: whether a grantee can bring an action for breach of a statutory warranty when it knew or should have known about the encumbrance upon which the action for breach is based. There is no Alaska case law that addresses this issue, even indirectly. AAA presented a number of out-of-state cases that support its contention that any knowledge it had of the Cosmos/Ramirez lease does not bar its claim of breach of warranty. Mr. Ramirez supported his claim to the contrary in part on *Somers v. Leiser*, 43 Wash.2d 66, 259 P.2d 843 (1953), which held that a "free of encumbrances" warranty does not cover easements that are known to the vendee. *Somers* is of particular relevance since it interpreted the Washington statute upon which the AS 34.15.030(b) is based. *See Domer*, 533 P.2d at 11.

Both parties are somewhat correct: AAA cites the general rule, while Mr. Ramirez relies on the principal exception to the rule. As the New Mexico Supreme Court explained in *Tabet Lumber Co. v. Golightly*, 80 N.M. 442, 457 P.2d 374, 375 (1969):

Encumbrances, however, fall into two categories: (1) those which infringe on the title itself; and (2) those which involve physical facts concerning the premises.... The courts appear to be unanimous in holding that where an encumbrance infringes upon the title itself, a purchaser's knowledge of it does not prevent recovery in an action for breach of covenant, but after stating this general rule, Powell, [Law of Real Property, 268.21 (Recomp.1968)], follows it with an exception:

[T]his statement must be qualified by excepting physical conditions of the land itself which were apparent on inspection and which are found to have been 'within the contemplation of the parties in agreeing on the purchase price.'

The more recent edition of Powell's treatise adds a second exception: if "the grantee knew of the encumbrance and agreed to the conveyance with the encumbrance intact," then "in effect, the grantee has waived his or her right to apply the title covenants to that particular encumbrance or interest." Powell, Law of Property, sec. 81A.06[3], at 81A–126–27 (1999). Powell notes in this respect that evidence of waiver can include an adjustment of the purchase price or some other aspect of the agreement to reflect the encumbrance. *Id.*

There are four material factual issues with respect to this analysis. The first is whether the parties knew about the Cosmos/Ramirez lease when AAA purchased the property from Mr. Ramirez. While both AAA and Mr. Ramirez presented evidence suggesting that neither of them knew about the lease, it would be exceedingly difficult for a finder of fact to conclude that either party lacked such knowledge. Mr. Ramirez was a party to the lease and signed it himself. As for AAA, its lease with Cosmos stated explicitly that both parties were aware of the Cosmos/Ramirez lease and of the cautionary letter, procured by Mr. Fuger, regarding the validity of that lease. There accordingly is no issue of fact regarding the parties' knowledge of the existence and terms of the Cosmos/Ramirez lease.

The second and third factual issues are whether the lease infringed on the title itself or involved physical facts concerning the premises. As noted above, there is no question that if it is valid, the lease infringed on the title itself, which suggests that AAA can maintain its breach of warranty claim should Ms. Totaro prevail on her breach of contract claim. Mr. Ramirez argues that the lease also involved physical facts concerning the property, because the gravel mining operation was a substantial physical presence on

the land. The court agrees that the existence of the operation may be relevant evidence of the parties' intent. But the fact that the operation was on the land is not dispositive, for there is no intrinsic tie between the lease and the operation—the lease and operation can and now do operate independently of one another. The lease therefore does not fall within the exception noted in *Tabet Lumber.*

The final issue concerns the intent of the parties. It appears that while both parties knew of the Cosmos/Ramirez lease, neither thought it was valid. This suggests that the conditions of the sale were not affected by the existence of the lease. But it also suggests that the parties were willing to ignore the lease, from which a finder of fact could infer that AAA was willing to purchase the property notwithstanding the encumbrance. The court has little evidence on either score,[3] and the available evidence does not unquestionably support the position of either AAA or Mr. Ramirez. Since the issue of the parties' intent is a material one which is in substantial dispute, the court therefore cannot rule as a matter of law that Mr. Ramirez either should or should not be liable for any breach of contract committed by AAA or Mr. Fuger.

APPENDIX B—Excerpts from Superior Court's Findings of Fact and Conclusions of Law of February 6, 2004

*Findings of Fact*

. . . .

Plaintiff [Totaro] continued to receive her royalty checks until August 1998. AAA also paid royalties to Mr. Ramirez until that date. The payments stopped when AAA purchased the property from Mr. Ramirez. The circumstances of the sale were as follows. Mr. Ramirez decided some time in July 1998 to sell the entire property. He placed an advertisement in the newspaper offering the property. He also came to the property and asked Mr. Fuger and Mr. Mearkle whether they were interested in purchasing the property. To put some pressure on them to sell, he indicated to them that he had another prospective buyer, even though no one had approached him with a concrete offer.

AAA decided it wanted to purchase the property. According to Mr. Fuger, AAA felt it had no choice but to purchase the property because of the legal deficiencies in the Cosmos/Ramirez lease. In particular, Mr. Fuger believed that that lease was unenforceable, which meant that if someone other than AAA purchased the property, AAA could be forced to leave, losing its only asset and source of revenue. The court found this testimony credible, given the legal advice Mr. Fuger had received from Mr. McCombs.

AAA and Mr. Ramirez then negotiated the terms of the sale. During these negotiations, Mr. Fuger and Mr. Ramirez discussed the impact of the sale on the Cosmos/Ramirez and Cosmos/AAA leases. Mr. Fuger insisted at trial that he asked Mr. Ramirez if there was a lease on the property and that Mr. Ramirez said no. Mr. Ramirez claimed to have no recollection of that conversation, and he asserted that he thought the Cosmos/Ramirez lease had expired. The court has difficulty with all of this testimony. Mr. Fuger was well aware of the Cosmos/Ramirez lease—indeed, Mr. Fuger relied on what he perceived to be the unenforceability of that lease as the reason he purchased the property. Mr. Ramirez also was well aware of the lease, since he signed it; and he cannot very well have thought it expired since he was continuing to receive royalty payments from it. Mr. Ramirez in particular came across as a very clever and accomplished businessman; the court finds it hard to believe he was not well aware of the precise status of the Cosmos/Ramirez lease, and that had he thought

---

**3.** Mr. Ramirez points to certain "AS IS, WHERE IS" language in the earnest money instructions as evidence of the parties' intent to exclude the Cosmos/Ramirez lease from the warranty cove-nant. This language is far from unambiguous, for as AAA points out, it could refer to the physical features of the land, not the lease.

the lease had expired, he would have made that fact very clear to AAA.

The more likely scenario is that Mr. Fuger and Mr. Ramirez thought at the time that if AAA bought the property, then neither of them would have to worry about the Cosmos/Ramirez lease anymore, and that their testimony at trial was colored by their effort to blame each other for any liability that might be owed to Ms. Totaro. This is supported by the fact that Mr. Fuger and Mr. Ramirez each testified at trial that they agreed that AAA would not have to pay Mr. Ramirez once it purchased the property, that they discussed whether AAA would have to pay Ms. Totaro, and that Mr. Ramirez stated that Mr. Fuger should talk to an attorney about any responsibilities AAA had to Ms. Totaro. This testimony indicates that Mr. Fuger and Mr. Ramirez were well aware of the leases at issue and that they decided not to deal with the ramifications of the sale on the Cosmos/AAA lease.

At the close of the negotiations, AAA proposed a purchase price of $650,000.00 with a down payment of $100,000.00, and Mr. Ramirez accepted. AAA authorized the purchase through a corporate resolution, and an Earnest Money Receipt and Agreement ("Purchase Agreement") was executed by AAA and Mr. Ramirez on August 5, 1998. The Purchase Agreement was provided and prepared by Mr. Ramirez, although it contained a provision recognizing AAA's right to consult an attorney about the agreement. The Purchase Agreement also contained several somewhat inconsistent provisions relating to the possible existence of encumbrances on the land.

On the one hand, the Purchase Agreement stated that Mr. Ramirez was to provide a title insurance policy to AAA, and that if the title insurance policy disclosed any defects or encumbrances, then AAA could renegotiate the purchase price to cover the defects or encumbrances. A title insurance policy was issued, but it listed no defects or encumbrances relating to the Cosmos/Ramirez lease. Accordingly, the purchase price in the

Purchase Agreement remained at $650,000.00 and was not renegotiated by Mr. Ramirez and AAA.

The Purchase Agreement further provided that the property would be conveyed free of encumbrances except for those specifically listed, and that any encumbrances not listed in the Purchase Agreement could be discharged at closing out of the purchase money. No encumbrances were listed in the Purchase Agreement, and none were discharged at closing.

On the other hand, the Purchase Agreement provided that "[t]he undersigned parties acknowledge and agree that the property is sold in an "as is, where is" condition with no warranties implied or expressed by seller except those which appear in writing on the receipt and agreement to purchase dated 8/6/98...." The Purchase Agreement also stated that the "[p]arties hereto agree that these instructions constitute the final agreement between the parties and acknowledge by execution hereof that all contingencies prior to closing of this transaction have been met or waived or otherwise arranged between the parties outside this escrow...." The Purchase Agreement thus appeared both to place the responsibility for revealing encumbrances upon Mr. Ramirez and to require AAA to raise any issues it may have had regarding encumbrances.

On August 26, 1998, Mr. Ramirez executed a Statutory Warranty Deed conveying the Property to AAA. The Statutory Warranty Deed made the conveyance subject to a number of reservations and exceptions, but it did not make any title exception for any rights in the property held by Cosmos, Ms. Totaro, or anyone else by virtue of either the Cosmos/Ramirez or the Cosmos/AAA leases.

. . . .

*Conclusions of Law*

. . . .

*Allocation of liability between AAA and Mr. Ramirez*

AAA argues that Mr. Ramirez should be held liable because he breached the covenant

against encumbrances. In particular, AAA asserts that Mr. Ramirez warranted in both the earnest money agreement and the statutory warranty deed that there were no encumbrances upon the property. According to AAA, the Cosmos/Ramirez lease was an encumbrance upon the property, and hence Mr. Ramirez breached the warranties. Mr. Ramirez responds that AAA knew about the Cosmos/Ramirez lease and so it has waived any claim of breach of the warranties. AAA replies that any knowledge it had of the lease is irrelevant, because the warranties apply notwithstanding actual or constructive knowledge of an encumbrance.

The court addressed the legal issues underlying defendants' claims in its June 2, 2003 order denying their cross motions for summary judgment on this issue. Based on the undisputed facts set forth in the motions, the court ruled that the Cosmos/Ramirez lease is an "encumbrance" on the property. The facts adduced at trial fully supported this ruling.

The more difficult legal issue is whether a grantee can bring an action for breach of a statutory warranty when it knew or should have known about the encumbrance upon which the action for breach is based. The court ruled in its June 2, 2003 order that a party's knowledge of an encumbrance that infringes on title ordinarily will not defeat that party's claim of a breach of the warranty regarding encumbrances, unless one of two exceptions is shown: 1) where physical conditions on the land were apparent on inspection and affected the purchase price; and 2) where the grantee knew of the encumbrance and the parties acted in a manner that reflected a waiver of any claim of breach by the grantee (such as a modification of the purchase price reflecting the encumbrance). The court found that there were material issues of fact regarding the second exception that precluded granting summary judgment to either party.

The court then identified four material factual issues: whether the parties knew of the encumbrance; whether [the] lease infringed on the title itself; whether the lease involved physical facts concerning the property; and whether the parties acted in a manner that reflected an intent by AAA to proceed notwithstanding the encumbrance. The third issue is a legal issue, and as noted above, the court has found that the lease infringed on title. The court has reevaluated the other three issues in light of the evidence presented at the trial, and will address them in turn.

*Knowledge of the lease.* Both AAA and Mr. Ramirez continue to claim in their proposed findings of fact and conclusions of law that they were misled by the other party regarding the existence and/or validity of the leases. These positions are not supported by the evidence. Mr. Fuger was quite clear in his testimony that he knew about the Cosmos/Ramirez lease, that he knew that the lease had a number of deficiencies, and that he purchased the property because he was concerned that someone else might buy the property and tell him to leave because the Cosmos/Ramirez lease was not valid. Mr. Fuger obviously knew about the Cosmos/AAA lease, since he signed it, and he testified that he was concerned throughout the sale negotiations about whether he would still have to pay Ms. Totaro royalties once he purchased the property.

Mr. Fuger asserts that Mr. Ramirez told him that there was no lease on the property and that he relied on that statement. While the court does not believe that Mr. Ramirez made such a straightforward statement, the court would not be surprised if Mr. Ramirez left Mr. Fuger with that impression, for as discussed below, the court finds it hard to believe that Mr. Ramirez said anything without carefully qualifying it. But Mr. Fuger simply could not have been misled by any such statement by Mr. Ramirez, for he knew all about the Cosmos/Ramirez lease, he knew that his lease was contingent on that lease, and so he knew that his company was on the property only by virtue of the lease between Cosmos and Ramirez. He accordingly had no reasonable basis for relying on some claim by Mr. Ramirez that there were no existing leases on the property.

Mr. Ramirez claims that he thought that the Cosmos/Ramirez lease had expired and that he had no knowledge of the Cosmos/AAA lease until he was told about it during the negotiations over selling the property. Both claims are very difficult to credit. Mr. Ramirez presented as a very careful, experienced, and clever businessman who watched everything he said extremely carefully. His testimony consistently contained qualifications and nuanced statements. In addition, Mr. Ramirez received royalties from 1984 through 1998, a period of 14 years; and the bulk of those royalties came from AAA. Under these circumstances, there simply is no way that Mr. Ramirez could not have been aware that AAA was mining gravel from his property and that it was doing so pursuant to the lease that he had signed with Mr. Nelson.

Mr. Ramirez also had to have known about the deficiencies with the lease he signed. As noted above, he was an experienced businessman and property owner. He participated in negotiations with Mr. Nelson regarding a new lease to cure the deficiencies. The court cannot escape the feeling that Mr. Ramirez felt no incentive to cure those deficiencies because they provided a potential vehicle by which he could have another party mine the gravel if Cosmos and AAA did not work out, and so they maximized his flexibility in deciding how he wanted the property to be mined.

In short, both AAA and Mr. Ramirez knew about both the Cosmos/Ramirez lease and the Cosmos/AAA lease when they negotiated and arrived at the land sale agreement. Given that knowledge, neither party could reasonably have relied upon any alleged misrepresentation by the other party.

*Physical conditions.* The court found in its June 2, 2003 order that the Cosmos/Ramirez lease did not involve physical facts concerning the property because there was no intrinsic tie between that lease and the gravel mining operations on the property. The evidence at trial indicated that the gravel mining operations were obvious to any casual observer and that it was clear that

AAA was conducting the mining operations. It is self-evident that the gravel mine was the principal basis for the purchase price. The issue, then, is whether that physical presence on the land necessarily implicated the Cosmos/Ramirez lease. This is a closer question than the court believed when it issued the June 2, 2003 order. The evidence indicated that the operations and lease were tied together in the minds of the parties and that any person who inspected the property would have been on notice that someone other than the owner was mining the gravel. The court accordingly concludes that there were physical features on the land which gave notice of the encumbrance and were within the contemplation of the parties when they negotiated the sale.

*Intent of the parties.* Both AAA and Mr. Ramirez were well aware of the potential legal issues revolving around the sale of the property. They discussed whether royalties would have to be paid under the two leases and whether the Cosmos/AAA lease would remain in effect once the property were sold. But notwithstanding those concerns, AAA decided to purchase the property. While there is no direct evidence that the legal uncertainties affected the purchase price, the court has no doubt that AAA carefully evaluated the relative costs and benefits of proceeding and decided that it was best to proceed and to run the risk that AAA would be held liable under the Cosmos/AAA lease.

The court accepts as credible Mr. Fuger's testimony that he felt he had no choice but to purchase the property. But the court finds that he felt this way because he did not want to lose his gravel mine. The court further finds that this concern was so strong that AAA would have purchased the property even if it knew for a fact that it had to keep paying royalties to Ms. Totaro; for AAA had been paying her and Mr. Ramirez royalties for many years, and by purchasing the property AAA would be increasing its future revenue stream since it would no longer have to pay Mr. Ramirez.

The court also recognizes that Mr. Fuger did not feel fairly treated by Mr. Ramirez

because Mr. Ramirez was not totally straight with him regarding the status of either the lease or other persons who might have wanted to purchase the property; and Mr. Ramirez did not identify the lease as an encumbrance in any of the legal paperwork. If there were a correlate to the comparative negligence doctrine, the court might well be inclined to place some liability on Mr. Ramirez. But the court is aware of no case law, and AAA cited none, that authorizes a court to share liability in the context of a claim of breach of a warranty against encumbrances.

In sum, while Mr. Ramirez was less than straightforward with AAA, the fact remains that AAA was aware of both the Cosmos/Ramirez lease and the potential liability imposed by the Cosmos/AAA lease, and it decided both to purchase the property and to stop paying royalties to Ms. Totaro. In so doing, it acted in a manner that precludes any liability on Mr. Ramirez's part by virtue of the breach of the Cosmos/AAA lease.